# EXHIBIT D



# Stern Center
## for Language and Learning

**CONFIDENTIAL**

**DIAGNOSTIC EVALUATION REPORT**

| | |
|---|---|
| Name: | Deanna Jones |
| Date of Birth: | July 30, 1966 |
| Dates of Evaluation: | March 8, 9, and 10, 2011 |
| Age at Evaluation: | 44 years 7 months |
| | |
| Current College: | Vermont Law School |
| Year: | Third (of Four) |
| | |
| Education: | B.A. in Psychology and Sociology from Vermont College (2007) |
| | |
| Address: | 561 East Hill Road |
| | Middlesex, VT 05602 |
| | |
| Referred By: | Clara Gimenez |

## REASONS FOR REFERRAL

Ms. Jones referred herself for a comprehensive assessment of her cognitive, academic, and attention skills at the suggestion of Clara Gimenez, Assistant Dean for Academic Affairs at the Vermont Law School. Ms. Jones has been legally blind since age 5 so has frequently relied on technology to help her access written material. Still, reading has also always been challenging, including learning how to read, so she has wondered if she also might have dyslexia. Now, as Ms. Jones prepares to take the Multistate Professional Responsibility Examination (MPRE) and Bar exam, she would like to better understand her learning profile and clarify her diagnosis so she can request the most appropriate accommodations. Thus, this evaluation was undertaken to identify Ms. Jones's information processing strengths and weaknesses, to document current achievement levels for reading and writing, to determine if she might have dyslexia, and to offer recommendations regarding accommodations and/or study strategies.

## RELEVANT BACKGROUND INFORMATION:

**Birth/Developmental/Medical/Family History:** Ms. Jones weighed 7 pounds 8 ounces at birth following an uneventful full term pregnancy and delivery. Developmental milestones (sitting, walking, talking) were achieved early to within normal limits. English is her first language. Medical history is positive for high fevers that required ice baths in infancy, as well as occasional ear infections (Swimmer's ear) and strep throat in childhood. After her older brother was diagnosed with macular degeneration when he had trouble seeing the board at the age of 8, Ms. Jones was evaluated and determined to have the same congenital condition (later identified as atypical retinitis pigmentosa with macular degeneration). When Ms. Jones was five years old, her vision was 20/60; within six months it deteriorated to 20/200. Initially, it primarily impacted her central vision and she had trouble seeing details. As she advanced in school, she became increasingly aware of her progressive vision loss. Until recently, her peripheral vision was good. No one in Ms. Jones's immediate family is known to have any academic difficulties; however, two nephews have struggled with reading and both have been diagnosed with dyslexia. In fact, after one

*BECAUSE ALL GREAT MINDS DON'T THINK ALIKE*

135 Allen Brook Lane, Williston, VT 05495-9209 ı Phone 802-878-2332, 800-544-4863 ı Fax 802-878-0230
1011 North Main Street Suite 28, White River Jct., VT 05001-6204 ı Phone 802-295-8773, 888-886-8463 ı Fax 802-295-8926
learning@sterncenter.org ı www.sterncenter.org



nephew was diagnosed and Ms. Jones recognized his reading difficulties were similar to those she experienced as a child, she, too, sought an evaluation and was told she had a reading disability.

**Educational History:** Ms. Jones was raised and educated in New Jersey. During early elementary school (kindergarten-second grade), Ms. Jones wore glasses and the print in books was fairly large so she believes she was able to view the material. Still, she had trouble learning to read. Consequently, she worked twice a week with a specialist for several years. When her mother inquired about possible reasons for her reading difficulties, she was told they were due exclusively to her low vision, not other learning issues. As Ms. Jones advanced in school (grades 3-5), she attended schools with open classrooms and, being highly social, she admits she spent more time "watching the atrium" or listening to other classes than doing her school work. The school recommended placement at a desk with sideboards and headphones, but Ms. Jones's mother did not want her to be viewed differently by her classmates. Instead, she advocated for Ms. Jones to have more time in the school's Learning Center. Ms. Jones recalls the assistance she received here was at a much lower level because they only used materials with large print. She admits she didn't work very hard, but earned satisfactory grades.

Unfortunately, by middle school when the expectations increased, Ms. Jones discovered her reading skills were several years behind those of her classmates. Ms. Jones's mother began working closely with Ms. Jones by organizing her homework, reviewing the material with her, and reading books/textbooks to her. Ms. Jones remembers feeling overwhelmed, and finding the instruction and discussions to be the most helpful. Unlike her brother, who excelled with taped textbooks, Ms. Jones found listening to books more confusing than helpful. By this time, she was also unable to read material in class unless it was enlarged to a size so large the paper was unwieldy; consequently, she "just sat through classes" and her mother taught her the information at home. With this assistance, Ms. Jones was able to earn B's, and by seventh grade, most skills (excluding grammar and spelling) were reportedly close to grade level. During middle school, Ms. Jones also attended a resource room where the teacher administered tests to her, reviewed information taught in class by writing on a white piece of paper with black marker, and helped her to believe in herself. Ms. Jones admits that when she first started middle school, she thought she was stupid. Ms. Jones also remembers having an Individualized Education Plan (IEP) that advised teachers to ignore spelling and grammar mistakes in her writing because they were attributed to her blindness.

In high school, Ms. Jones continued to earn average grades (B's and C's with the occasional A), and her mother tried to be actively involved in her learning although, as an adolescent, Ms. Jones was increasingly resistant to this. Ms. Jones was also losing more central vision so was experiencing dramatic changes in her sight. As a result, she sustained several biking accidents, and was required to ride a special shuttle bus. She also encountered subjects she "just didn't understand" (e.g., foreign language, grammar, diagramming sentences) so sometimes felt defeated and was increasingly reluctant to try. She continued to attend the resource room where she received help with her homework. Ms. Jones graduated from Hightstown High School with a grade point average of 3.2.

Ms. Jones then attended Kutztown University of Pennsylvania for a year where she had access to readers and taped textbooks through Recording for the Blind (RFB) but no other support. She listened to the tapes, but found classmates seemed to know and understand much more of the material than she did. Eventually, she stopped attending classes. She then convinced her family that college was not for her and instead opened a record store. After running the business for 2-3 years, she closed the business and moved to Vermont to be with her family.

The family then developed and ran several businesses together until Ms. Jones was offered an opportunity (through the Randolph Sheppard Act and Vermont Division for the Blind and Visually Impaired) to run cafeterias in state office buildings (e.g., National Life Building). Given her success in this position, she then bid for a state contract involving the food service at the Vermont State House and Governor's office.

She was awarded a two year contract with two one year renewals. In this position, she was again quite successful and received several awards.

In 2003, Ms. Jones began taking classes at Vermont College where there were no exams and she could work at her own pace on the required assignments and papers. She scanned her books, occasionally taped classes, used Kurzweil 3000 and ZoomText software on her computer to write papers and access written material, and was provided notetakers and readers as needed for accommodations. Although grades were not assigned, comments from Ms. Jones's professors in their qualitative assessment of her work are stellar. Ms. Jones successfully earned her B.A. degree in the Spring of 2007. Knowing she wanted to go to law school, she then took classes at Woodbury College to prepare for more classroom based learning. She also applied to take the Law School Admission Test (LSAT) with a reader and additional time. She was granted these accommodations but denied use of scrap paper during the test due to a late request, and Law School Admission Council (LSAC) officials wanted to invalidate her scores because she used a black marker (which she could see) to record her answers. Ultimately, she earned a score of 148, which she feels is an underestimate of her capabilities, because her access to the test was compromised. She explained that she had no visual referent, she couldn't remember most of the information read to her, and she was uncomfortable asking the reader to repeat things multiple times because she couldn't pinpoint exactly what she needed repeated.

Still, with these accommodations, Ms. Jones performed well enough on the LSAT to gain admission to Vermont Law School for the Fall 2008 semester. During her first year, she took 10 credits (2 classes with exams, plus a writing class) and was granted triple time for her exams, as well as use of ZoomText and Kurzweil 3000. During her first set of exams, she used all of the allotted time and earned a grade point average of 2.67. During the next five semesters, she continued to perfect her use of technology to assist her with reading, writing, and studying. She has also been provided mentors who review information and assist with outlining. Her grades have steadily improved, resulting in a current cumulative GPA of 3.2. Last semester, she earned a semester GPA of 3.87. Ms. Jones is scheduled to graduate in May 2012.

**Previous Test Results:** A review of standardized tests scores from middle school notes relative weaknesses ($21^{st} – 30^{th}$ percentile) in spelling for all three grades (6th, 7th, and 8th). Reading scores also fall at the lower end of average for sixth and seventh grades, but rise to the 67th percentile by the end of eighth grade. All other academic skills are average.

In 2000, Ms. Jones was evaluated by Shirley Bate, M.Ed., C.A.S. and Lorraine K. Clodfelter, M.S.. They administered the *Wechsler Adult Intelligence Scale-Third Edition* (WAIS-III), *Nelson Denny Reading Test* (NDRT), *Wechsler Individual Achievement Test* (WIAT), *Gray Oral Reading Test-Third Edition* (GORT-3), the Listening to Paragraphs subtest from the *Clinical Evaluation of Language Fundamentals* (CELF-3), *Comprehensive Test of Phonological Processing* (CTOPP), *Woodcock Reading Matery Test-Revised* (WRMT-R), *Lindamood Auditory Conceptualization Test* (LACT), and *Qualitative Spelling Inventory*. They found average cognitive abilities with relative strengths for spatial analysis, knowledge of social conventions, verbal abilities (vocabulary and reasoning), and auditory working memory, while relative weaknesses in visual attention to detail and fine motor speed, which are directly related to her blindness, were also noted. Phonological processing was inconsistent although weaknesses in phonological memory and phonological awareness (blending, segmenting) with nonsense words were observed. Academically, Ms. Jones's basic reading skills (word recognition, phonemic decoding) fell at the lower end of average and were significantly discrepant from her high average reading comprehension abilities as measured with a cloze procedure. Comprehension for longer passages with connected text was extremely weak (8th percentile). Finally, spelling skills were also below average, while her ability to write a descriptive essay was average. While this report did not specify a diagnosis, a subsequent addendum did diagnose a reading disability due to deficits in phonological memory and phonological awareness.

**Self Assessment:** Ms. Jones reports that she occasionally has trouble decoding or sounding out some words. More often, she needs to hear the word while reading it to know what it is. She admits she misreads words "all the time." She does not know if this is related to her blindness or her reading skills. She also finds she needs to reread information on average three times before the intended meaning is clear. Remembering what she reads is also challenging unless she takes notes while reading. When writing, she says she finds it hard to synthesize information but can easily develop and support an argument. She finds formal writing to be more difficult than informal communication. Generally, she feels she is able to effectively organize her thoughts when writing because she feels her sequencing skills are a strength; however, organizing large amounts of information can be quite difficult. Her grammar, spelling, and punctuation skills are also problematic. Ms. Jones also took one year of German in high school, found it hard to learn the vocabulary, didn't understand the grammar rules, and earned D's. It contrast, math concepts and skills have always come easily. When taught 1-1 to accommodate her blindness, she consistently earned A's for Algebra I, Algebra II, and Geometry in high school. Finally, Ms. Jones feels her time management, organization, and study skills are excellent.

Ms. Jones also believes she is a visual learner. Unlike her brother, she has always found taped textbooks more confusing than helpful. She is unable to use JAWS or Kurzweil 1000. She believes this is because she needs a visual referent. When reading or studying, she first listens while watching the highlighting on the screen. When she doesn't understand something, she goes back and replays this specific portion and/or uses ZoomText to enlarge the page so that she can read it. Ideally, she needs to replay and/or reread information at least three times. In addition, as she simultaneously watches and listens, she also takes notes on a white sheet of paper with a special black marker; she finds this helps her to remember the information. When using the closed circuit television (CCTV), Ms. Jones says she creates a spatial map in her head for each page so she can easily find sections she wants to review. Again, she reviews sentences multiple times. While this method is effective, it is time consuming and physically exhausting. As Ms. Jones explains, "One hour on the CCTV is like running a marathon." Generally, her eyes are physically fatigued within 5-10 minutes and she becomes physically sick to her stomach.

Ms. Jones also acknowledges a few idiosyncrasies with listening. She notes that when she is on the phone and someone says something in the background, she is unable to process information from either source. She adds she prefers listening with dual speakers.

Ms. Jones began learning Braille three years ago and says she was able to learn the contractions within 6 months. She finds her fingers are fairly sensitive and believes she will eventually become proficient with this method of reading; however, currently, her fluency is not strong enough to warrant use of Braille for a standardized test.

Finally, Ms. Jones admits she struggles with outlining because she finds it hard to differentiate relevant from irrelevant information, or details from general categories. When provided with an outline, she can usually sort information, but she finds it hard to generate the original framework on her own.

## DIAGNOSTIC PROCEDURES

Due to Ms. Jones's blindness, modifications to the standardized testing procedures were often necessary for tasks with visual stimuli. This included enlarging the materials, permitting her to use her personal magnifier, CCTV, or computer with ZoomText and Kurzweil 3000 to access the information, and/or allowing her to continue past the prescribed time limits. When time limits were extended, her progress after both double and triple time was sometimes recorded. To minimize eye fatigue, efforts were also made to alternate visual/writing tasks with auditory/speaking tasks as much as possible. The following tests were administered:

Wechsler Adult Intelligence Scale-Fourth Edition (WAIS-IV)
Rey Osterrieth Complex Figure Drawing (ROCF)
Wide Range Assessment of Memory and Learning-Second Edition (WRAML2) Selected subtests
California Verbal Learning Test – 2ⁿᵈ Edition (CVLT-II)
Clinical Evaluation of Language Fundamentals-Fourth Edition (CELF-4)  Selected subtests
Comprehensive Assessment of Spoken Language (CASL)  Selected subtests
Comprehensive Test of Phonological Processing (CTOPP)
Woodcock Johnson III Tests of Cognitive Ability –  Cognitive Fluency Cluster
Woodcock-Johnson III Tests of Achievement  (Form B) - Academic Fluency Cluster
Wechsler Individual Achievement Test-Third Edition (WIAT-III) Reading Composite
                                        Oral Reading
                                        Spelling
                                        Math Fluency
Nonsense Oral Reading Passages
Gray Oral Reading Tests-Fourth Edition (GORT-4)
Nelson-Denny Reading Test (Forms G and H)
Wechsler Individual Achievement Test-Second Edition (WIAT-II) Written Expression subtest
Achenbach Adult Self Report (ASR)
Conners Adult ADHD Rating Scale (CAARS)
Behavior Rating Inventory of Executive Function-Adult (BRIEF-A)

## SCORING

Scores for most testing instruments are based on a normal curve so that standard scores (SS) have a mean of 100 and a standard deviation of 15, scaled scores (ss) have a mean of 10 and a standard deviation of 3, and percentile ranks (%ile) have a mean of 50 and reflect the number of individuals out of 100 that would earn a lower score. Therefore, average scores fall in the following ranges:  90-110, 8-12, and 25th –75th percentile.

## BEHAVIORAL OBSERVATIONS

Ms. Jones was personable, hard working, and cooperative.  She conversed easily with the examiner, had a good sense of her strengths and weaknesses, and demonstrated excellent insight into what works for her and why.  Rapport was easily established.  Ms. Jones also willingly complied with all tasks, persisted when they became challenging, and was not interested in taking breaks because she wanted to approximate the Bar exam testing environment as much as possible. She worked extremely hard.  Still, by the afternoon of the third day, she appeared visibly tired, so scores earned during this period may underestimate skills. Otherwise, concentration was excellent as Ms. Jones worked diligently, was not easily distracted, and displayed no impulsivity or hyperactivity.  She did, however, work through all visual tasks slowly, which is understandable given her blindness.  Still, since Ms. Jones was eager to do well and generally seemed to perform to the best of her ability, these results are believed to be an accurate reflection of her current skills and capabilities.

## DIAGNOSTIC EVALUATION RESULTS

The Wechsler Adult Intelligence Scale- Fourth Edition (WAIS-IV) was administered to determine Ms. Jones's current level of intellectual functioning and to identify her information processing strengths and weaknesses.  This test consists of 15 subtests that assess a variety of skills that cluster into four composites that provide global measures of verbal ability (Verbal Comprehension Index), nonverbal reasoning and visual processing (Perceptual Organization Index), working memory (Working Memory Index), and visual scanning and motor speed (Processing Speed Index).  Italicized subtests are not

included in the calculation of the Index Score but presumably assess similar skills. Ms. Jones's scores are indicated below.

| WAIS-IV | SS/s | %ile |
|---|---|---|
| **Verbal Comprehension** | 108 | 70 |
| Vocabulary (word knowledge) | 13 | 84 |
| Similarities (abstract verbal reasoning) | 10 | 50 |
| Information (fund of factual knowledge; long-term retrieval) | 12 | 75 |
| *Comprehension (understanding of social rules and conventions)* | 12 | 75 |
| **Working Memory** | 95 | 37 |
| Digit Span (auditory short-term and working memory) | 11 | 63 |
| Forward | 8 | 25 |
| Backward | 11 | 63 |
| Sequencing | 15 | 95 |
| Arithmetic (mental computation; auditory attention) | 7 | 16 |
| *Letter Number Sequencing (auditory short-term and working memory)* | 14 | 91 |
| **Perceptual Reasoning w/CCTV** | 92 | 30 |
| Block Design (abstract visual-spatial reasoning) | 10 | 50 |
| Matrix Reasoning (visual information processing/abstract reasoning skills) | 10 | 50 |
| Visual Puzzles (spatial organization; part-to-whole construction) | 6 | 9 |
| **Processing Speed** | 56 | .2 |
| Symbol Search (visual discrimination speed and accuracy) | 2 | 0.4 |
| Digit Symbol-Coding (visual processing/fine-motor speed and accuracy) | 2 | 0.4 |
| **FULL SCALE** | 88 | 21 |
| **GENERAL ABILITY INDEX (GAI)** | 101 | 53 |

On this administration of the WAIS-IV, Ms. Jones earned average Verbal Comprehension (SS=108, 70th percentile), Perceptual Reasoning (SS=92, 30th percentile), and Working Memory scores (SS=95; 37th percentile), as well as an extremely weak (and invalid) Processing Speed score (SS=56, < 1st percentile) to result in a low average Full Scale score of 88 (21st percentile). However, given her blindness, which unquestionably compromises her performances on most of the subtests comprising the Perceptual Reasoning and Processing Speed composites, this Full Scale score is definitely not the best measure of her underlying capabilities, particularly since the extremely low Processing Speed score spuriously lowers the Full Scale score because it is so discrepant from her other abilities. Instead, a better measure is felt to be a range between the Verbal Comprehension and Working Memory composites because the visual demands are negligible and the underlying skills are more like those required in law school. Thus, Ms. Jones's cognitive abilities are felt to fall solidly in the average range and her learning profile is discussed in greater detail below.

As noted above, Ms. Jones's strengths lie with her verbal abilities (vocabulary, verbal reasoning, recall, oral expression) as she consistently earned many of her highest scores (75th -84[th] percentile) when defining words (Vocabulary), explaining proverbs or reasons for various social rules (Comprehension), and recalling various historic, geographic, or scientific facts (Information). Her definitions and explanations were comprehensive yet concise. She has clearly benefited from the education and experiences she has had, and retained much of what she has learned. Slightly less developed but solidly average (SS=10, 50th percentile) was her ability to describe commonalities in verbal concepts (Similarities). Here, she was vague and struggled to abstract overriding categories from the details. Slightly less developed and extremely variable are Ms. Jones's auditory memory skills. Although her overall composite score is average, subtest scores range from low average (SS=7, 16th percentile) to superior (SS=15, 95th percentile). Qualitatively, she excels when provided an organizational format to use (e.g., sequential order) when recalling information, but struggles with rote memorization (Digit Span-

Forward) or when she must interpret, remember, and manipulate information while holding it in memory (Arithmetic). Qualitatively, Ms. Jones was not able to hold the word problems in her head and asked to have nearly half of the questions repeated. She also struggled to perform the calculations in her head; three times, she answered the question correctly but exceeded the time limit. Weaknesses in auditory memory clearly impeded her performance on these tasks.

Ms. Jones's perceptual reasoning skills, which are compromised to an unknown degree by her blindness, are at least average. Here, Ms. Jones used her personal magnifier or held the visual stimuli 1-3 inches from one eye, yet managed to earn average scores when completing symbolic analogies and patterns (Matrix Reasoning) and replicating two dimensional designs with colored cubes (Block Design). The latter is especially impressive because she spent much of her time trying to see the design and a large portion of this score is based on speed. Although unable to view the designs as a whole, Ms. Jones was easily able to break the designs into parts and then align the block(s) correctly. She also effectively used verbal mediation to guide her (e.g., "white down in corner") and seemed to enjoy the task. Upon completion, she said, "I prefer this to reading." Had time limits not been imposed for this subtest, Ms. Jones most likely would have earned a considerably higher score.

Since Ms. Jones's blindness causes her to complete visual tasks three times slower than that of her peers, her speed for each item on the Visual Puzzles subtest was clearly compromised. Like the Block Design subtest, she used her personal magnifier and/or held the stimulus book close to one eye. This time, her timed performance fell in the borderline range but rose to the average range when provided 100 percent (SS=9, 37th percentile) and 200 percent (SS=10, 50th percentile) more time to accommodate her visual processing speed weaknesses. Thus, Ms. Jones's perceptual reasoning skills are at least average and may actually be a processing strength if her visual processing speed can be accommodated.

Finally, a significant weakness is consistently noted for Ms. Jones's visual scanning and clerical speed as she earned extremely low scores when transcribing symbols associated with specific numbers (Coding) and discriminating symbols (Symbol Search). Ms. Jones used her CCTV to complete the Symbol Search task. For the Coding subtest, the evaluator rewrote and enlarged the key at the top of the page using a special black marker. Ms. Jones then used her personal magnifier or held the test close to her eye. Ms. Jones's progress within the standard time frame (2 minutes), twice as much time (4 minutes), and three times as much time (6 minutes) were recorded. The results revealed that Ms. Jones worked at a consistent pace of 22-23/items per minute. While this places her performance below the first percentile with the standardized administration, her performance rises to average when provided triple time. This suggests that Ms. Jones performs visual motor tasks three times slower than an average middle aged adult .

In summary, Ms. Jones is a blind adult with a complex learning profile. Overall cognitive abilities are estimated to fall solidly in the average range with strengths specific to most aspects of verbal thinking (vocabulary, long term recall, reasoning, expression). Her perceptual reasoning is also good and may even be a processing strength if her visual processing speed is accommodated. Ms. Jones easily breaks complex designs into their component parts. Auditory memory varies. While she struggles to remember and/or manipulate auditory information, she can easily recall and/or manipulate information if provided an organizational framework in advance. Finally, consistent with her blindness, Ms. Jones performs all visual scanning and visual motor tasks <u>very</u> slowly because she can't see the information and devotes much of her time trying to view a portion of the stimulus.

**Memory:** To further evaluate different types of memory (e.g., visual, auditory, verbal, working, immediate, delayed, recognition, etc), the <u>Rey Osterreith Complex Figure Drawing</u> (ROCF) and selected subtests from the <u>Wide Range Assessment of Memory and Learning</u>, Second Edition (WRAML2) were administered. Each of these and the composites they comprise are described below, along with Ms. Jones's scores based on age norms.

| TEST/Cluster/Subtest | Description | ss | % |
|---|---|---|---|
| **WRAML2** | | | |
| Story Memory-Immediate | Measures immediate recall of orally presented stories. | 6 | 9 |
| Verbatim | Recalling specific words in the story | 6 | 9 |
| Gist | Recalling the main ideas of the story | 6 | 9 |
| Story B - 177 words | | 7 | 16 |
| Story C - 203 words | | 5 | 5 |
| Story Memory-Delayed | Measures the ability to retell stories heard earlier. | 6 | 9 |
| Story Memory -Recognition | Measures the ability to respond to multiple choice questions pertaining to stories heard earlier. | 6 | 9 |
| Sentence Memory | Measures ability to repeat sentences of increasing length and complexity | 10 | 50 |
| Verbal Learning Immediate | Measures ability to recall a list of words with four presentations | 6 | 9 |
| Verbal Learning Recall | Measures the ability to recall a list of previously learned unrelated words | 5 | 5 |
| Verbal Learning Recognition | Measures ability to recognize words from a list presented 30 minutes earlier | 5 | 5 |
| Verbal Working Memory | Measures the ability to reorganize orally presented verbal information according to specific criteria | 8 | 25 |
| **ROCF** | | | |
| Copy | Assesses the ability to copy a complex design | 9 | 37 |
| Immediate Recall | Assesses the ability to draw a complex design immediately after copying it | 12 | 75 |
| Delayed Recall | Assesses the ability to draw a complex design after a 45 minute delay | 11 | 63 |

The strength of Ms. Jones's visuospatial skills was clear from her impressive performance with the drawing task (ROCF). When copying the complex design, she used her personal magnifier and again held the paper inches from her eye. Despite her fragmented vision, her approach was organized, systematic, and configural (not fragmented). She began on the right, drawing an outline of the right half of the major figure, then divided this drawing into halves and quadrants, before adding details into each of the quadrants. After adding primary details to the top and bottom, she adopted a similar approach for the left side of the major figure. Details on the left were added last. Ultimately, she lost points only because her drawing was a little large and she omitted one line she may not have seen. Recall immediately after presentation, and after a delay, were even better as she earned scores at the upper limit of average. Ms. Jones's visual memory is a significant strength despite her blindness.

In contrast, Ms. Jones's auditory memory is considerably weaker. Although her sentence memory was average, her auditory working memory (Verbal Working Memory), word list memory (Verbal Learning), and memory for longer connected text (Story Memory) were considerably diminished. Verbal Working Memory (i.e., ability to manipulate information while holding it in memory) dropped to the lower limit of average as she had trouble reorganizing more than four pieces of information according to the prescribed criteria (e.g., in order of size); her errors were both omissions and substitutions. When recalling the stories (Story Recall), she stated the conclusion presented at the end of the story first, and then returned to the beginning of the story and recalled several salient details; however, much of the information in the middle was omitted. The amount of information recalled also diminished as the number of words increased, and Ms. Jones failed to accurately retrieve this information when presented with a multiple choice recognition format. On a list learning task (WRAML-2) requiring Ms. Jones to recall repeated unrelated words, she took a similar approach (last information first, first information second, medial information omitted). Her outcome on both immediate and delayed recalls, as well as forced choice recognition, were below average. She made several false positive and false negative errors indicating she experiences interference with increasing information to be processed.

To further assess verbal memory and retrieval, the <u>California Verbal Learning Test-II</u> (CVLT-II) was administered. Here, Ms. Jones was required to learn a list of 16 words across five trials, and was asked to recall them immediately, and after a short interference delay, under free recall and cued recall conditions. These words, unlike the previous list, can be categorized to make recall more efficient. Percentiles are

used to indicate her performance based on the previously described ranges. Average is (A), above average (AA), and below average (BA). Ms. Jones's scores were as follows:

| CVLT-2 | Raw Score | %ile | Level |
|---|---|---|---|
| Trial 1 Correct      (number of words recalled after first presentation) | 5 | 6.7 | BA |
| Trial 5 Correct      (number of words recalled after fifth and final presentation) | 10 | 6.7 | BA |
| Total Learning Slope Trials 1-5 | 1.2 | 30.8 | A |
| % Recall from Primacy  (recalling words from the beginning of the list) | 34% | 16 | A |
| % Recall from Middle    (recalling words from the middle of the list) | 27% | <1 | BA |
| % Recall from Recency  (recalling words from the end of the list) | 39% | >99 | AA |
| Semantic Clustering  (grouping words with similar meaning) | - 0.6 | 16 | A |
| Serial Clustering   (recalling words in the order presented) | 1.9 | 84 | A |
| Trial B Correct | 5 | 16 | A |
| Proactive Interference   (detrimental effect of prior learning on the retention of new info) | 0% | 69 | A |
| Across-Trial Recall Consistency  (recalling the same words across trials) | 85 | 50 | A |
| Repetition Errors        (repeating words already recalled) | 7 | 69 | A |
| Intrusion Errors        (recalling words that were not on the list) | 0 | 16 | A |
| Short-Delay Free Recall    (ability to recall words after short delay) | 8 | 6.7 | BA |
| Short-Delay Cued Recall    (ability to recall words w/categorical cues after a short delay) | 10 | 6.7 | BA |
| Long-Delay Free Recall    (ability to recall words after a 20-30 minute delay) | 10 | 16 | A |
| Long-Delay Cued Recall    (ability to recall words w/categorical cues after a 20-30 minute delay) | 10 | 6.7 | BA |
| Yes/No Recognition Hits  (ability to recognize words presented earlier) | 14 | 6.7 | BA |

Ms. Jones recalled 5 out of 16 words on the first trial of List A which is below average in comparison with similarly aged peers. Her performance over subsequent trials improved in a steady, but stepwise fashion as she was able to recall 9, 9, 11, and 10 out of 16 words on the 2nd, 3rd, 4th, and 5th trials, respectively. Still, her total recall of words across the five learning trials was below average (T-score = 38; 12th percentile rank for her age and gender), which is commensurate with her performance on the WRAML2. In contrast, her learning slope is average, because she made substantial gains over time, but clearly required multiple presentations.

On the interference trial, Ms. Jones again recalled 5 out of the 16 words, which is consistent with initial recall and not indicative of significant proactive interference (detrimental effect of prior learning on the retention of new information). She also tended to recall the same words across trials, and made very few repetition (i.e., repeating words already recall) or intrusion errors (i.e., thinking words were on the list when they weren't). Thus, her attention was good and she was building on the information learned from each attempt. Qualitatively, she again recalled significantly more information from the end and beginning of the list, and significantly less from the middle. Ms. Jones also used serial clustering (repeating words in the order in which they are presented) more than semantic clustering (grouping words with similar meaning to guide her recall), which is usually not the most effective strategy. Her recall after both short and long delays (both with and without semantic cues) was below average. Recognition memory was stronger because she correctly identified more words than she could recall, but it was still weak (i.e., below average) relative to similarly aged peers because of two false negatives and one false positive response.

In summary, the results from the CVLT-II indicate diminished acquisition of information leading to poor recall and recognition. These findings also support slowed auditory processing speed. Across these verbal memory tasks, it is apparent that Ms. Jones's verbal memory is limited. When the quantity of information exceeds her attention and processing spans, she demonstrates a recency and primacy effect by limiting recall to information at the beginning and end, while forgetting information in the middle. Frontloading her understanding of what she is about to learn can assist her with increasing the amount of information she acquires as she studies. Rote memory is discouraged even though it may seem easier initially.

**Language Processing:**  To assess the impact of Ms. Jones's auditory memory weaknesses on her listening comprehension, the Understanding Spoken Paragraphs subtest from the Clinical Evaluation of Language Fundamentals-Fourth Edition (CELF-4) was administered, as well as selected subtests from the Comprehensive Assessment of Spoken Language (CASL) given her concerns about her grammar.  Since Ms. Jones is considerably older than the oldest normative populations for these tests (CELF-4:  17-11 to 21-11; CASL: 21-0 to 21-11), these scores should be interpreted with caution although language skills generally do not decline with age.  They do, however, tell us how Ms. Jones's skills compare with those of young adults. Ms. Jones's scores were as follows:

| TEST/Cluster/Subtest | Description | SS/ss | %ile |
|---|---|---|---|
| **CASL** | | | |
| Grammatical Morphemes | Measures metalinguistic knowledge of morphemes and the application of morphological rules. | 88 | 21 |
| Grammaticality Judgment | Measures the ability to recognize grammatically correct sentences and to correct those with errors | 92 | 30 |
| **CELF-4** | | | |
| Understanding Spoken Paragraphs | Measures listening comprehension by asking a variety of comprehension questions about passages read orally | 8 | 25 |

Ms. Jones's comprehension and recall for 2 of the 3 stories read to her (CELF-4) were excellent as she accurately recalled all main ideas and most details.  However, for the second paragraph presented, she made a correct inference, but missed the main idea and forgot most of the details.  Reasons for this inconsistent performance are not clear, but could reflect variable attention, weaknesses in verbal integration, and/or being overwhelmed by too much information (this passage contained 116 words while the others contained 79 and 55).  In addition, Ms. Jones's grammar skills were relatively weak, as she earned scores at the lower end of average ($21^{st} – 30^{th}$ percentile) when recognizing and correcting sentences with grammatical errors, or making the appropriate morphological changes to words in sentences to emulate the grammatical relationship presented in a second pair of sentences. Most of her errors were specific to verb agreement.  However, these grammar tasks place a heavy load on verbal working memory and were administered at the end of the third day when Ms. Jones was visibly fatigued.

**Phonological Processing**:  Since difficulties with in phonological awareness, phonological memory, and/or rapid naming are core processing weaknesses typically associated with dyslexia, the Comprehensive Test of Phonological Processing (CTOPP) was administered.  Again, Ms. Jones is older than the eldest normative age group (17-0 to 24-11), so these scores should be interpreted with some caution; however, like verbal abilities, phonological awareness skills should not decline with age like other skills (e.g., memory, speed).

| TEST/Cluster/Subtest | Description | SS/ss | %ile |
|---|---|---|---|
| **CTOPP** | | | |
| **Phonological Awareness** | Assesses the ability to manipulate syllables and sounds in words (i.e., blend, segment, delete, etc.). | **106** | **65** |
| Elision | Measures the ability to remove phonological segments from spoken words to form other words | 9 | 37 |
| Blending Words | Measures the ability to synthesize sounds to form words. | 10 | 50 |
| Segmenting Words | Measures the ability to segment words into phonemes. | 9 | 37 |
| **Alternate Phonological Awareness** | Assesses phonological awareness using nonsense words, thereby reducing the memory component. | **100** | **50** |
| Segmenting Nonwords | Measures the ability to segment nonwords into phonemes. | 9 | 37 |
| Blending Nonwords | Measures the ability to synthesize sounds to form nonwords. | 11 | 63 |
| **Phonological Memory** | Assesses the ability to code information phonologically for temporary storage in working memory or short term memory. | **88** | **21** |
| Memory for Digits | Measures the ability to accurately repeat number sequences. | 10 | 50 |
| Nonword Repetition | Measures the ability to accurately repeat nonwords. | 6 | 9 |

| | | | |
|---|---|---|---|
| **Rapid Naming (CCTV)** | Assesses efficient retrieval of information frequently associated with early reading (numbers, letters). | 49 | < 1 |
| Rapid Digit Naming | Measures the ability to rapidly name numbers. | 2 | 1 |
| Rapid Letter Naming | Measures the ability to rapidly name letters. | 1 | < 2 |
| **Alternate Rapid Naming (CCTV)** | Assesses rapid naming for items less associated with literary experience (objects, colors). | | |
| Rapid Color Naming* | Measures the ability to rapidly name colors. | | |
| Rapid Object Naming | Measures the ability to rapidly name objects. | 5 | 5 |

\* not administered due to color blindness

Ms. Jones's phonological awareness skills (blending, segmenting, etc.) were solidly average when deleting, blending, and segmenting sounds in both real and nonsense words. However, the deletion task was performed very slowly, suggesting these skills might not be automatic. In addition, Ms. Jones asked to have many of the longer Blending items repeated, again revealing weaknesses in auditory memory. When segmenting real words, Ms. Jones sometimes combined phonemes to create one sound (e.g., /st/ rather than /s/ /t/), whereas when segmenting nonsense words, her performance was more variable as she both combined, and omitted, sounds.

Phonological memory tasks were also inconsistent as Ms. Jones earned an average score when recalling number sequences (Memory for Digits) and a below average score when repeating nonsense words (Nonword Repetition). Qualitatively, Ms. Jones's span was accurate to a maximum of 6 digits and words containing 4 syllables. Thus, a relative weakness in auditory memory is again observed.

Finally, Ms. Jones's rapid naming skills appear to be extremely weak; however, this score is not valid given her blindness and her age. Presumably she devoted a significant amount of time to actually "seeing" the numbers, letters, and objects. Furthermore, since processing speed does decline with age, comparing her skills to those of a young adult is inappropriate.

In summary, Ms. Jones's phonological awareness skills are average, but not automatic. Phonological memory is slightly less developed (low average) and variable. Finally, her rapid naming skills appear to be extremely weak; however, the confounding effects of age and her blindness places the validity of these results in serious question.

**Processing Speed:** In an effort to further assess processing speed, the subtests from Cognitive Fluency cluster of the Woodcock Johnson Tests of Cognitive Ability-III (WJTCA-III) were administered. These subtests are described below, and her scores based on age norms are presented.

| TEST/Cluster/Subtest | Description | SS | % |
|---|---|---|---|
| **Cognitive Fluency** | Measures the ease and speed by which an individual performs cognitive tasks | 73 | 3 |
| Retrieval Fluency | Assesses ability to name examples of specific categories quickly | 98 | 46 |
| Rapid Picture Naming (CCTV) | Assesses ability to name common pictures quickly | 77 | 6 |
| Decision Speed  (CCTV) T/2x/3x | Assesses ability to circle pictures of conceptually similar objects quickly | 64/96/113 | 1/41/81 |

The impact of Ms. Jones's blindness on different types of processing speed is clearly evident from these variable scores. Although she retrieves information at an average pace, when confronted with speeded visual scanning tasks, her rapid naming is below average and her conceptual categorization is extremely weak. However, if provided with additional time (e.g., 2x and 3x), Ms. Jones's performance rises to average and high average levels, respectively. Thus, to accommodate the slowing effects of Ms. Jones's blindness and to allow her to perform commensurate with the average person her age, Ms. Jones needs three times as much time.

## ACADEMIC ACHIEVEMENT

**BASIC READING SKILLS:** The <u>Gray Oral Reading Tests</u>-Fourth Edition (GORT-4), and selected subtests from the <u>Wechsler Individual Achievement Test</u>-Third Edition (WIAT-III) were administered to assess different aspects of Ms. Jones's basic reading skills (decoding, sight word recognition, fluency). She used the CCTV for each task. The specific subtests and clusters are delineated below. Her scores for the WIAT-III are based on age norms, while those for the GORT-4 are based on age norms for the oldest normative population (18-0 to 18-11); thus, the latter should be interpreted with some caution.

| TEST/Cluster/Subtest | Description | SS/ss | % |
|---|---|---|---|
| **WIAT-III (CCTV)** | | | |
| **Basic Reading** | | **100** | **50** |
| Word Reading | Assesses sight vocabulary and the ability to read lists of familiar and unfamiliar words | 107 | 68 |
| Pseudoword Decoding | Assesses the ability to apply phonetic decoding skills by reading nonsense words representative of phonetic structures in English. | 94 | 34 |
| **Oral Reading Fluency** | Measures speed, accuracy, fluency, and prosody of contextualized oral reading. | **65** | **2** |
| Oral Reading Accuracy | Accuracy when reading text aloud. | 90 | 25 |
| Oral Reading Rate | Speed when reading text aloud. | 62 | 1 |
| **Reading Composite** | | **87** | **19** |
| **GORT-4 (CCTV)** | | | |
| Accuracy | Assesses accuracy when reading graded passages aloud | 13 | 84 |

When reading lists of words (real and nonsense), Ms. Jones read slowly, and syllable by syllable, which is understandable because this is how she views a word. While this resulted in a score at the upper end of average for real words (Word Reading), her skills drop to the lower end of average when reading nonsense words (Pseudoword Decoding). Qualitatively, she made errors with vowels (dem-ai-gog/*demagogue*, bron/*broan*), but also occasionally added (florit/*floit*) or omitted sounds or syllables (e-mack-ee-us/*eminacious*), especially with multisyllabic nonsense words. A number of her mistakes also suggested a whole word approach to reading by identifying words from a few salient letters or focusing on some (but not all) letters in the word (rhythm/*rhyme*, consequential/*quincuncial*). This was particularly apparent when orally reading the WIAT-III passages as she omitted the word *the* and made the following substitution errors: points/*pours*, the/*true*, distinctions/*destinations*. While such errors could reflect underlying weaknesses in phoneme-grapheme mapping which is characteristic of dyslexia, they could also be related to her blindness and/or variations in attention. Consequently, Ms. Jones was also asked to read aloud passages from the GORT-4. Again, Ms. Jones read slowly, word by word, and syllable by syllable. However, she also made very few errors and sometimes self corrected the errors she did make (compromise/*comprise*, gruding/*grudging*, of/*or*). Overall, her error pattern was similar to that observed with the WIAT-III as she occasionally omitted small words (*the, a*) or substituted words containing many of the same letters (vile/*veil*, humanity/*humility*, this/*his*, casual/*causal,* climbs/*claims*). The difference between the accuracy scores for the GORT-4 and WIAT-III is a function of the normative samples, not her performance. Since very few decoding errors were observed although she read multisyllabic words very slowly and deliberately, her errors are felt to reflect her blindness and potentially weak working memory, not a deficit in phonological decoding or dyslexia.

To further investigate this, Ms. Jones was also asked to orally read two <u>Nonsense Passages</u> designed to identify reading difficulties in adult dyslexics because half of the words are multisyllabic nonsense words. Understandably, she read the passages very slowly (134 seconds) but made an average number of errors (7 out of 29). This accuracy score is comparable to that typically made by average readers (x=6.9, 50th percentile), and better than that demonstrated by individuals with compensated dyslexia (x=15), and significantly better than that demonstrated by dyslexic readers (x=20). Her errors included the following:

twandy/*tawndy*, tre-plee/*treeple*, paibley/*paible*, catwince/*catwicine*, jack-e-pot/*jacepot*, skelly-tees/*scelliates*, and maistic/*miastic*

**READING COMPREHENSION:** Ms. Jones's reading comprehension was assessed using several different instruments: Gray Oral Reading Tests-Fourth Edition (GORT-4), Wechsler Individual Achievement Test-Third Edition (WIAT-III), and the Nelson Denny Reading Test (NDRT). Time limits were not imposed for the GORT-4 and WIAT-III.. For the GORT-4, Ms. Jones was asked to read graded passages aloud using the CCTV and upon conclusion was asked comprehension questions; she was not permitted to look back at the passage. In contrast, Ms. Jones read the WIAT-III passages silently using the CCTV and was then asked comprehension questions; the questions were open ended (not multiple choice) and she was permitted to refer back. Ms. Jones's scores for the WIAT-III are based on age norms, while those for the GORT-4 are based on age norms for the oldest normative population (18-0 to 18-11); thus, the latter should be interpreted with some caution. Ms. Jones's scores for the WIAT-III and GORT-4 are as follows

| TEST/Cluster/Subtest | Description | SS | % |
|---|---|---|---|
| **WIAT-III** | | | |
| Reading Comprehension (CCTV) | Measures untimed silent reading comprehension (literal and inferential) for different types of text (e.g. narrative, expository, letters to the editor, etc.) through open ended questions; looking back is permitted. | 95 | 37 |
| **GORT-4** | | | |
| Comprehension  (CCTV) | Measures oral reading comprehension by posing multiple choice questions assessing literal and inferential comprehension questions after reading a passage aloud; looking back is not permitted. | 10 | 50 |

Ms. Jones scores for both of these reading comprehension tasks are average. Qualitatively, for the GORT-4, she had the most trouble ascribing feelings to different characters, but was usually able to infer, to recall details, to deduce why something may have occurred, and to recognize aberrant information; occasionally, she had trouble isolating the main idea. For the WIAT-III, Ms. Jones reread the passages, sometimes more than once, before responding; sometimes she read aloud. Once she forgot the question while rereading. Occasionally, her answers were incomplete when recalling specific details; more often she had trouble identifying the main idea or the *most important* reason.

To further assess Ms. Jones's reading comprehension, the Nelson Denny Reading Test (NDRT) was administered. To compare her performance using either the CCTV or Kurzweil 3000, alternate forms of the test were used. Her performances for both subtests (Vocabulary and Comprehension) when timed, and when provided twice, and three times, as much time were determined relative to those of college graduates (grade 16). Accuracy rates (% correct) were also computed. Ms. Jones's scores were as follows:

| NDRT Subtest | Standard Time | | | 2x Time | | | 3x Time | | |
|---|---|---|---|---|---|---|---|---|---|
| | SS | %ile | % correct | SS | %ile | % correct | SS | %ile | % correct |
| Vocabulary - CCTV | 74 | 4 | 98 | 95 | 37 | 89 | 103 | 58 | 93 |
| Vocabulary - Kurzweil | 65 | 1 | 100 | 75 | 5 | 100 | 98 | 47 | 95 |
| | | | | | | | | | |
| Comprehension - CCTV | 65 | 1 | 100 | 65 | 1 | 100 | 65 | 1 | 100 |
| Comprehension - Kurzweil | 65 | 1 | 89 | 74 | 4 | 96 | 101 | 53 | 97 |

These results clearly reveal that Ms. Jones's vocabulary and understanding for what she reads is very good because her accuracy rates are consistently high (89 to 100 percent). Her comprehension accuracy is especially strong as she didn't miss any questions when using the CCTV, and missed only the first and second to last questions when using Kurzweil 3000; thus, her understanding for what she reads is

excellent. Consequently, her low scores occur **ONLY because she is unable to complete a sufficient number of items within the allotted time.** Presumably her slow reading rate is due to her blindness and, to a lesser degree, weaknesses in working memory. Thus, when given three times as much time to complete tasks, most of Ms. Jones's performances rise to average and are more commensurate with her cognitive abilities. The exception is her performance on the Comprehension subtest with the CCTV. Here, although Ms. Jones answered every question correctly, with 3x as much time, she was still only able to complete slightly more than half the test. Her reading rate is extremely slow.

**Reading Rate**: Silent reading rate, as determined by Ms. Jones's progress after one minute of reading (NDRT) was 132 wpm when using Kurzweil 3000 with ZoomText, and 56 wpm when using the CCTV. However, since this is not the most reliable measure of reading rate, specific reading rates for each of the GORT-4 and WIAT-III passages were also calculated. Using the CCTV, Ms. Jones's *oral reading rates* for the GORT-4 passages ranged from 47 wpm to 68 wpm, while similar *oral reading rates* for the WIAT-III stories ranged from 60 wpm to 69 wpm. Finally, *silent reading rates* using the CCTV ranged from 65 wpm to 77 wpm. As the average student typically reads at rates of 150-180 orally and 200-250 words silently (> 250 wpm for college students), all measures of Ms. Jones's oral and silent reading speed are significantly below average; in fact, they are approximately one third of average. Thus, Ms. Jones will need 3x the average amount of time when reading to accommodate her disability.

In summary, Ms. Jones's word recognition skills are sound and commensurate with her abilities, while decoding skills are slightly less developed. Reading comprehension is at least average and improves when Ms. Jones can reread information. However, Ms. Jones's reading rate is approximately one third that of the average adult; thus, she will need 3x as much time to read the same material as her peers. Differences between the two types of technology (CCTV vs. Kurzweil) primarily affect speed, rather than accuracy. Specifically, Ms. Jones's rate when using the CCTV for small bits of information (a sentence or line of words) is faster than when using the Kurzweil 3000; however, her pace when using the CCTV to read passages of connected text is significantly slower than when using the Kurzweil. Since the CCTV also accelerates eye fatigue and is physically exhausting for Ms. Jones, sole use of this form of technology with passages or for extended time periods is not recommended.

**WRITTEN LANGUAGE**: Selected subtests from the Wechsler Individual Achievement Test-Second Edition (WIAT-II) and the Wechsler Individual Achievement Test –Third Edition (WIAT-III) were administered to assess various aspects of Ms. Jones's written expression. Each of these subtests is described below, along with Ms. Jones's standard and percentile scores based on age norms.

| TEST/Cluster/Subtest | Description | Timed (SS) | 2x | 3x | 50 min |
|---|---|---|---|---|---|
| **WIAT-III** | | | | | |
| Spelling | Assesses ability to spell words presented orally | 90 | | | |
| **WIAT-II (Kurzweil)** | | | | | |
| Written Expression | Assesses writing fluency, sentence combining, and expository writing | 100 | 100 | 100 | 102 |
| Fluency | Assesses the speed at which a person can write examples for a target category | 25-49 | 25-49 | 25-49 | 25-49 |
| Spelling | Assesses the ability to spell correctly when writing an essay/letter. | 25-49 | 0 | 0 | 0 |
| Punctuation | Assesses ability to punctuate correctly when writing an essay/letter | 1-24 | 1-24 | 0 | 0 |

Consistent with her performance on the Retrieval Fluency subtest (SS=98; 46th percentile), Ms. Jones was able to generate examples (WIAT-Word Fluency) at an average pace (25th - 49th percentile). However, when given 15 minutes to write a persuasive letter on a specific topic with the aid of Kurzweil 3000, she had just started her first argument when time was called (99 words). When given twice as much time (30 minutes), she was in the middle of her second argument (167 words). She completed her letter in 50

minutes (363 words) and had finished her third argument (274 words) with three times as much time (45 minutes).

Ms. Jones's letter was well organized as she included introductory and concluding paragraphs, devoted a paragraph to each of her reasons, and provided some evidence. Sentence formulation was good and word choice was advanced, descriptive, and varied. Transition words were also included to link ideas. In contrast, there were also <u>numerous</u> spelling and punctuation errors as she omitted apostrophes, misplaced or omitted commas, and misspelled 12 words (genrally/*generally*, absorbsion/*absorption*, payed/*paid*, educatied/*educated*, municiple/*municipal*, presure/*pressure*, elsewhaere/*elsewhere*, synthasize/*synthesize*, eleviate/*alleviate*, whith/*with*, hourse/*house* or *horse*, porwer/*power*). Similar errors were observed when combining sentences, while syntax and grammar were average. She did, however, have trouble summarizing multiple ideas into one concise, well written sentence. While some of Ms. Jones's spelling errors could reflect typing mistakes, significant issues with spelling are clearly evident. More formal evaluation of Ms. Jones's spelling revealed average skills with errors specific to vowels (irregular, schwa, silent), VCE syllables, silent consonants, and doubled consonants. These suggest relative weaknesses in visual sequential memory and/or a lack of familiarity with English spelling patterns.

Thus, despite good fluency, ideation, development, organization, sentence structure, and vocabulary, significant weaknesses in spelling, punctuation, and fluency are evident in Ms. Jones's written expression. Generally, it takes her at least 3x as long to write what the average person her age can write in 15 minutes. To accommodate her blindness, it is recommended that she be provided 3x as much time and have access to a computer with spelling and grammar checkers.

**MATHEMATICS:** Ms. Jones's math skills were not assessed.

## ATTENTION/SOCIOEMOTIONAL SCREENING

**Rating Scales:** First, Ms. Jones was asked to complete the <u>Achenbach Adult Self-Report</u> (ASR) to assess the frequency of different behaviors that correlate with various syndromes or DSM-IV Scales. Scores are reported as T-scores which have a mean of 50 and a standard deviation of 10. Thus, scores > 69 would be considered clinically significant, while those 65-69 are borderline. These are highlighted. The results are summarized below.

| ASR Syndrome Subscale | T Score | ASR DSM-Oriented Subscale | T Score |
|---|---|---|---|
| Anxious/Depressed | 64 | Depressive Problems | 63 |
| Withdrawn | 51 | Anxiety Problems | 65 |
| Somatic Complaints | 61 | Somatic Problems | 55 |
| Thought Problems | 51 | ADHD Problems | 51 |
| Attention Problems | 52 | Inattention | 51 |
| Rule-Breaking Behavior | 50 | Hyperactive-Impulsive | 52 |
| Aggressive Behavior | 52 | Antisocial Personality Problems | 51 |
| Intrusive | 53 | Avoidant Personality Problems | 50 |

Although Ms. Jones's score for Anxiety Problems is *borderline significant* because she reports that she *frequently* doesn't eat well, has trouble sleeping, is nervous, worries about the future, and *sometimes* lacks energy, and feels tired, sad, or guilty, such feelings and behaviors are not clinically significant, and can be attributed to her highly stressful and demanding situation (e.g., attending law school with a disability, requesting accommodations for the MPRE, etc.).

In addition, Ms. Jones was read the Behavior Rating Inventory of Executive Function-Adult Version (BRIEF-A) to assess different aspects of executive functioning, while her close friend completed the Screening Version of the Connors Adult ADHD Rating Scales (CAARS) to assess the frequency of inattentive, hyperactive, and impulsive behaviors across settings. Significant scores were not obtained for any of the indices or subtests on either questionnaire. Her attention and executive functioning skills are average; she does not demonstrate significant difficulties with concentration, organization, hyperactivity, impulsivity, procrastination, or executive functioning (i.e., the ability to plan, initiate, conduct, monitor, modify, and complete activities to reach a goal).

## SUMMARY AND RECOMMENDATIONS

Ms. Jones is a third year student (of four years) at Vermont Law School with blindness due to atypical retinitis pigmentosa with macular degeneration diagnosed at the age of 5. Historically, she had trouble learning to read for which she worked with a tutor in elementary school for several years. When her mother questioned whether these reading difficulties could be due to something more than her visual deficit, she was assured this was not the case. However, when tested by a certified learning specialist 30 years later, she was diagnosed with a reading disability due to weaknesses in phonological awareness and phonological memory. Throughout her education, teachers enlarged class materials and Ms. Jones had access to resource rooms/learning centers where special educators helped with homework and administered any classroom tests. Taped textbooks were also available but she did not find these helpful. Ms. Jones's grades were average (B's and C's), and improved over time with the aid of her mother who organized her homework, reviewed class materials with her, and read books/textbooks to her. Ms. Jones graduated from high school with a 3.2 GPA. After an unsuccessful year at college where she felt completely overwhelmed because she only had access to readers and taped textbooks, Ms. Jones left school to become an entrepreneur. While this venture was successful, she moved to Vermont three years later to join her family. Together they ran several businesses together until Ms. Jones was offered an opportunity to run cafeterias in state office buildings through the Randolph Sheppard Act. She did this for 8-9 years and again was quite successful. She then began taking classes at Vermont College and successfully earned a B.A. degree in 2007. Here, she had access to ZoomText and Kurzweil 3000 which helped her access the reading for her classes and write the required papers; comments from her professors regarding her work are stellar. In preparation for law school, she then took classes at Woodbury College, where she also excelled.

In 2008, Ms. Jones entered Vermont Law School and has performed well; her current cumulative GPA is 3.2. It has admittedly not been easy, but with hard work and persistence, Ms. Jones has continued to develop ways to use technology to help her with reading, writing, and studying. Accommodations have included triple time for exams and access to a mentor who reviews material and assists with outlining. Now that she is preparing to take the MPRE and Bar exam, she would like to avoid the impediments she experienced when taking the LSAT. Then, she was provided a reader and 50 percent more time, but did not have sufficient time and found the reader more confusing than helpful because she didn't have a visual referent, couldn't remember what the reader said, and couldn't identify what she had missed to request repetition; furthermore, she was denied access to scrap paper on which to take personal notes. While she earned a score of 148, she believes this was not representative of her skills because her access to the test was so seriously compromised. She hopes this evaluation will document her learning profile and disability(ies) so more appropriate accommodations can be provided for the MPRE and Bar exam.

Current test results find Ms. Jones to be a blind adult with a complex learning profile. Overall cognitive abilities are at least average with strengths specific to most aspects of verbal thinking (vocabulary, reasoning, expression). Her perceptual reasoning is also average. If she were not legally blind, the probability is that she most likely would excel on visuospatial activities. Ms. Jones easily processes

complex designs in a part to whole fashion, and her visual memory appears to be a strength. Auditory memory is more variable. Although Ms. Jones struggles to remember and manipulate verbal information which is attributed to her limited memory span, she can more easily recall and reorganize information when provided an organizational framework in advance. Phonological awareness (blending, segmenting) is now average but may not be automatic. Academically, Ms. Jones's word recognition skills are sound (upper limits of average), while relative weaknesses in decoding and grammar (verb agreement) are observed. Reading comprehension is also very good as long as opportunities to reread are available to accommodate her working memory weaknesses; however, she does struggles with some aspects of higher level verbal reasoning (categorizing, synthesizing, identifying main ideas, prioritizing, differentiating relevant from irrelevant information). Understandably, reading rate is very slow. Finally, when writing, Ms. Jones's ideation, development, organization, sentence formulation, and word choice are strong, while significant weaknesses in spelling, punctuation, and occasionally grammar are evident.

Thus, Ms. Jones presents with **blindness** (ICD-9: 369.9) and a **Learning Disorder, NOS** (DSM-IV: 315.9) characterized by significant information processing weaknesses specific to visual processing speed and auditory attention and memory systems. These deficits, in combination with her relative weaknesses in phonological decoding/encoding, grammar, and some aspects of higher level verbal reasoning, significantly compromise her listening comprehension, subtle aspects of reading comprehension, the mechanical aspects of writing, and the rate at which she completes reading and writing tasks. Thus, they represent a more generalized learning disorder (i.e., LD-NOS). Generally, three times as much time is needed for Ms. Jones to perform tasks at rates consistent with an average adult of similar age.

Since Ms. Jones's blindness and information processing weaknesses are significantly interfering with Ms. Jones's ability to listen, read, and write at levels and/or speeds commensurate with the average person, they represent significant functional limitations and constitute disabilities as defined by the ADAAA. Thus, accommodations are warranted to mitigate their negative impact.

Given this complex learning profile, the following recommendations are offered:

**General:**
- Hopefully, Ms. Jones can use the results from this evaluation to better understand her strengths and weaknesses, devise additional ways to use her strengths to work around her difficulties, and be able to explain what she needs and why in both vocational and educational settings.

- Given Ms. Jones's significant weaknesses in auditory memory, she may want to obtain a more comprehensive and thorough evaluation of her central auditory processing.

- Given her positive response to initial Braille instruction, Ms. Jones is encouraged to continue her learning and practice with this method of communication.

- In preparation for the Bar exam, Ms. Jones may want to enroll in an exam preparation course because it will provide her with an organizational framework to use when studying while clearly delineating what she will be required to know.

- Given her disabilities, Ms. Jones is eligible for accommodations in educational and vocational settings. The accommodations should be individualized, based on her needs and the demands of the setting. They should also be appropriate and not compromise the essential requirements of the course. These could include the following depending on course and job requirements.

**Academic Accommodations:**

- Testing modifications to reduce the limitations imposed by her blindness and memory span weaknesses. These may include:
  - Additional time (3x as much time or 200% more time than the time allotted) to complete quizzes, exams, standardized tests, and licensing exams so that Ms. Jones can take the time she needs to read and reread. Time restrictions that cause her to rush can increase her misreading of words which can cause her to misinterpret questions.
  - Access to a computer with ZoomText Magnifier/Reader and Kurzweil 3000 (screen reader) because
    - Ms. Jones needs to read and listen to written information simultaneously. Using only a CCTV causes significant eye fatigue, induces motion sickness, and is not efficient for lengthy readings or long periods of time. Similarly, hearing information solely via a reader or tape is both insufficient and inappropriate given Ms. Jones's weaknesses in auditory memory. Multisensory presentations are both preferred <u>and necessary</u> because they provide the most efficient way for her to review information multiple times to accommodate memory weaknesses.
    - Ms. Jones also needs to be able to view, reread, and hear what she writes. She should also have access to a grammar and spell checker.
    - Ms. Jones needs to use the same technology and systems she uses while attending law school in her everyday life. To require her to learn and use different accommodations and technology for the MPRE is unfair because typical students taking the test are not required to do this.
  - Provision of a scribe to help Ms. Jones complete any forms or special answer sheets (e.g., bubble sheets) because she will not be able to see this information. Alternatively, she could write (or her scribe could write) directly on the test with a special black marker.
  - Separate testing location so that she can listen to her computer and converse with her scribe without disturbing others.
  - Permission to take short breaks during an exam to accommodate eye fatigue.
  - Permission to use a special black marker and access to scrap paper so she can make personal notes to accommodate her weaknesses in working memory.

- Ms. Jones may occasionally need additional time to complete written assignments; thus, they should either be assigned early and/or she should be granted extensions. Occasionally, she may need to earn a grade of Incomplete for a class so that she can complete any outstanding work (e.g., papers) after the semester has ended.

- Ms. Jones should not be penalized for any spelling, grammar, or punctuation errors on in-class assignments and exams. She should also be permitted to use the grammar and spell checkers on her computer although this will not completely eliminate her errors. Thus, access to a proofreader/editor for material written outside of class will also be necessary.

- Given her weaknesses in listening comprehension, Ms. Jones will need copies of lecture notes from the professor or a responsible peer. She should also take notes herself as this will help her keep her attention. She may also want to consider using a digital Smartpen or some other form of technology that records auditory information in a form that can be transferred to her computer. Outlines for lectures should also be provided in advance as much as possible so that Ms. Jones can better prepare for class and follow class lectures more easily.

- The amount of information orally presented to Ms. Jones at one time should be limited. If too much information is presented too quickly, she may become overloaded and will remember very little. Similarly, since Ms. Jones may occasionally miss or misunderstand complex or lengthy information presented orally, she is encouraged to check her understanding by summarizing and/or paraphrasing the information in different words. Individuals are also encouraged to repeat or clarify directions if asked and/or to provide them in writing as well.

18

- Given the amount of time Ms. Jones will need to devote to each of her classes, she is encouraged to take a reduced course load (8-10 credits), while being considered a full time student, as this will represent a full time load for her. She should work with her advisor to plan how this might happen since some of her courses may need to be taken in a particular sequence or as a block.

## Reading, Writing, and Studying:

- Since Ms. Jones sometimes has trouble recognizing and creating organizational structures, she is encouraged to read the chapter summaries, abstracts, and headings in her textbooks, law journals, etc. before actually reading the information. This will provide her with a framework to use in organizing information as she reads it. Mentors and tutors may also have suggestions regarding the best way(s) for her to "front load" an organizational structure for a course, lecture, chapter, article, etc. Different approaches may be required for different types of reading. Discovery learning is discouraged.

- Ms. Jones should receive direct instruction in outlining strategies. The use of kinesthetic organizers, drawing from the work of Mary Ellen Moreau from Mindworks, Inc., should be considered. In addition, given her strengths in perceptual organization, Ms. Jones might be able to use semantic maps, graphic organizers, and/or different text structures (e.g., enumerative, descriptive, comparison/ contrast, cause/effect, problem/solution, etc.), perhaps eventually in combination with Braille, to help organize her reading, writing, or studying in ways that are more meaningful to her (see *Five Expository Text Structures* and *Designing Semantic Maps*). This would help her to better distinguish between main ideas and supporting details, as well as to better conceptualize how ideas relate to one another. The software programs, *Inspiration* (www.inspiration.com) or Don Johnston's *DraftBuilder* (www.donjohnston.com) might be able to assist with these activities.

- To improve comprehension while reading, Ms. Jones must be an active participant in the process by using different active reading strategies such as visualizing, notetaking, paraphrasing, summarizing, predicting, etc.*).* It will be important for her to
  - reduce reading material into small manageable chunks
  - paraphrase and summarize the information as she goes along, either orally or in writing
  - think about how the different aspects of the material are similar/different from each other
  - identify main ideas and distinguish critical details from unessential information
  Activities from Suzanne Carreker's program, *Developing Metacognitive Skills: Vocabulary and Reading Comprehension* (www.neuhaus. org) would also be useful in developing these metacognitive strategies for listening and reading. See enclosed *Reading Comprehension: Visualization, Inferential, and Metacognitive Strategies; How to Read Essays You Must Analyze;*

- Ms. Jones's higher level verbal reasoning skills could be improved through direct instruction with activities that teach her to categorize and classify information, differentiate details from main ideas in paragraphs, and identify main ideas or topic sentences. The most advanced book for the *Reading and Reasoning* program (*Book 2 or 3*) (www.epsbooks.com), would be an excellent resource for activities at the single word, sentence, and passage level. *Writing Skills, Book III*, by Diana Hanbury King (www.epsbooks.com) would also be an excellent resource for transferring this knowledge to writing. Finally, Judith Hochman's *Teaching Basic Writing Skills* and/or the *Paragraph Writing Strategies* from the Learning Strategies Curriculum at the University of Kansas could be use to extend these strategies to multiple paragraphs (essays).

- Given her limited memory span and weaknesses in listening comprehension, Ms. Jones is also encouraged to reorganize or "chunk" similar information as she hears or reads it. While this may initially seem challenging, this strategy will help her to remember more information in the long term rather than trying to remember individual details. Understanding new material before memorizing it is also critical; rote

19

memory is discouraged. Thus, Ms. Jones is encouraged to describe new concepts in her own words and to try to put them in a sequence or story, or relate them to something visual or personal (a salient event), using multiple modalities before committing them to memory. Repeated exposure will be essential. An acronym to keep in mind is PAR for Picture it, Associate it, Review it. (see *Memory and Study Aids*)

- Some basic spelling and punctuation rules (e.g., silent e, doubling rule, use of commas, etc.) could be taught or reviewed with Ms. Jones. (See *Capitalization and Punctuation Rules* and *Spelling Rules*) The program, *Spellography*, available at www.soprisswest.com., is also recommended because it explicitly teaches spelling patterns and generalizations, as well as morphology for improved spelling. Finally, to address Ms. Jones's concerns about her grammar, activities in *Writing Skills, Books II-III*, by Diana Hanbury King (www.epsbooks.com), *Winston Grammar Program*, or the *Sentence Writing Strategy* from the Learning Strategies Curriculum at the University of Kansas are recommended to help Ms. Jones better understand English syntax/grammar and how words can be shifted around, deleted, and added when conveying written messages, as well as how those shifts impact meaning.

It was a pleasure working with Ms. Jones and we wish her all the best. She is a bright, articulate, personable, and hardworking adult who has the cognitive and academic skills to graduate law school and pursue her career aspirations. Hopefully, these suggestions, in combination with the recommended accommodations, will help her to successfully complete her program and obtain appropriate accommodations for the MPRE and Bar exam. If there are any questions regarding this report, please feel free to contact us.

Lori G. Van Allen, M.S., NCSP
Educational Diagnostician
Nationally Certified School Psychologist (#21193)

Sharon G. Leach, Ph.D.
Clinical Neuropsychologist
Vermont Licensed Psychologist-Doctorate (#848)

Blanche Podhajski, Ph.D., CCC-SLP
President
Associate Clinical Professor of Neurology
University of Vermont College of Medicine

cc: Deanna Jones
    561 East Hill Road
    Middlesex, VT  05602

Tim Elder, Esq.
Brown, Goldstein, Levy  LLP
120 East Baltimore, Suite 1700
Baltimore, MD  21202

Emily Joselson, Esq./Michele Patton, Esq.
Langrock, Sperry, & Wool, LLP
111 S. Pleasant St.   P.O. Drawer 351
Middlebury, VT  05753

**Enclosures:** *Livescribe Smartpen; Reading Comprehension: Visualization, Inferential, and Metacognitive Strategies; How to Read Essays You Must Analyze; Five Expository Text Structures; Designing Semantic Maps; Memory and Study Aids; Capitalization & Punctuation Rules; Spelling Rules;*