# EXHIBIT I



# THE MPRE
### MULTISTATE PROFESSIONAL RESPONSIBILITY EXAMINATION

# *2011*
# *Information*
# *Booklet*

**Saturday, March 5, 2011**
**Friday, August 5, 2011**
**Saturday, November 5, 2011**



**NATIONAL CONFERENCE OF BAR EXAMINERS**

# Keep This Booklet
# for Reference

Test services for the MPRE are provided by ACT. For the following information, please write to the addresses shown below, or telephone between 8:30 a.m. and 5:00 p.m. central time, Monday through Friday.

### Application and Administration

> National Conference of Bar Examiners
> MPRE Applications
> 101 ACT Drive
> P.O. Box 4001
> Iowa City, IA 52243-4001
> Phone: (319) 341-2500*
> **mpre.registration@act.org**
> **www.ncbex.org** or **www.act.org/mpre**

### Questions Concerning MPRE Scores

Include examinee name, Social Security number, birth date, test date, and signature.

> National Conference of Bar Examiners
> MPRE Records
> 101 ACT Drive
> P.O. Box 4001
> Iowa City, IA 52243-4001
> Phone: (319) 337-1304*
> **mpre.score@act.org**

### Testing Accommodations Inquiries

> National Conference of Bar Examiners
> MPRE Testing Accommodations
> 101 ACT Drive
> P.O. Box 168
> Iowa City, IA 52243-0168
> Phone: (319) 341-2500*

*TDD for persons with hearing impairments:
(319) 337-1701 (must call from a TDD)

**NOTE:** The information in this booklet is believed to be correct at the time of publication. Since rules and policies of jurisdictions change, applicants are advised to consult the jurisdictions directly for the most current information.

Copyright 2010 by the National Conference of Bar Examiners. All rights reserved. No part of this publication may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopy, recording, or any information storage and retrieval system, without permission in writing from the publisher. Printed in the U.S.A.

# Contents

**Notice to Examinees**. . . . . . . . . . . . . . . . . . . 2

**Introduction**. . . . . . . . . . . . . . . . . . . . . . . . 3
   The Multistate Professional Responsibility
     Examination. . . . . . . . . . . . . . . . . . . . . . . 3
   Jurisdiction Information . . . . . . . . . . . . . . . . . 3
   Copyright Notice . . . . . . . . . . . . . . . . . . . . 4

**MPRE Application Procedures** . . . . . . . . . . . . 4
   Test Dates and Application Deadlines . . . . . . . 4
   Examination Fee . . . . . . . . . . . . . . . . . . . . 4
   Online Registration . . . . . . . . . . . . . . . . . . . 5
   Paper Application . . . . . . . . . . . . . . . . . . . . 6
   Admission Ticket. . . . . . . . . . . . . . . . . . . . . 6
   Test Center Locations . . . . . . . . . . . . . . . . . 7
   Test Center Assignments . . . . . . . . . . . . . . . 7
   Change of Test Centers . . . . . . . . . . . . . . . . 7
   Accommodations for Applicants with
     Disabilities . . . . . . . . . . . . . . . . . . . . . . . 7
   Reapplying to Take the Examination . . . . . . . . 8

**Test Day Information** . . . . . . . . . . . . . . . . . . 8
   Admission and Identification . . . . . . . . . . . . . 8
   What to Bring . . . . . . . . . . . . . . . . . . . . . . 9
   What Not to Bring . . . . . . . . . . . . . . . . . . . . 9
   Prohibited Behaviors. . . . . . . . . . . . . . . . . . 10
   Disruptions in Testing and Potential
     Compromises . . . . . . . . . . . . . . . . . . . . . 10
   Test Center Review. . . . . . . . . . . . . . . . . . . 11

**MPRE Scores** . . . . . . . . . . . . . . . . . . . . . . 11
   Scoring Process . . . . . . . . . . . . . . . . . . . . 11
   Score Reports. . . . . . . . . . . . . . . . . . . . . . 12
   Additional Score Reports . . . . . . . . . . . . . . . 12
   Cancellation of Scores by NCBE. . . . . . . . . . 14
   Requests for Rechecking of Answer Sheets . . 14

**MPRE Content and Preparation** . . . . . . . . . . 14
   Overview of the Examination. . . . . . . . . . . . . 14
   Subject Matter Outline. . . . . . . . . . . . . . . . . 17
   Test Preparation . . . . . . . . . . . . . . . . . . . . 20

**MPRE Sample Questions** . . . . . . . . . . . . . . . 21
**Appendix A: Test Center Locations
and Codes** . . . . . . . . . . . . . . . . . . . . . . . . . 37
**Appendix B: Accommodations for
Applicants with Disabilities** . . . . . . . . . . . . . 42

1

## NOTICE TO EXAMINEES

NCBE assists bar admission authorities by developing bar examination components, including the MPRE. NCBE holds the copyright to these exams and to their content, and exam content may be considered for reuse in future exams or in copyrighted educational materials. Both disclosure of exam content and cheating on a test are prohibited, as such practices undermine the integrity and fairness of the examination process.

The following conduct is prohibited during the examination:
• Bringing unauthorized devices (whether turned on or off) or unauthorized materials into the testing room, including, but not limited to, calculators, cameras, cell phones, pagers, personal digital assistants, text messaging devices, audio or video recording devices, scanners, language translators, and written materials;
• Bringing test materials, unauthorized devices, or unauthorized materials out of the testing room during any scheduled or unscheduled break or at the conclusion of the testing period;
• Copying answers from another examinee or sharing answers with another examinee; and
• Continuing to work after a supervisor has instructed examinees to stop writing.

The following conduct is prohibited after the examination:
• Sharing the substance or details of any test question, including the question's fact pattern, option choices, or answer, in whole or in part, with anyone via electronic (including e-mail, blogs, and online social and professional networking sites), telephonic, written, oral, or other means;
• Reproducing, paraphrasing, summarizing, or describing to any other person any test content from memory after leaving the testing room; and
• Forwarding, re-posting, hosting, or otherwise advancing the distribution of exam content, on the Internet or via other means, that others have disclosed.

Unauthorized disclosure of exam content or engaging in prohibited conduct during the examination could result in some or all of the following penalties:
• Civil liability;
• Criminal penalties;
• Cancellation of the examinee's test scores;
• Denial of the examinee's application to sit for future exams;
• Denial of the examinee's bar application on character and fitness grounds; and
• Disciplinary action by a bar authority if the examinee is already admitted to practice law.

2

# Introduction

### The Multistate Professional Responsibility Examination

The Multistate Professional Responsibility Examination (MPRE) is administered by ACT on behalf of the National Conference of Bar Examiners (NCBE). The MPRE is based on the law governing the conduct of lawyers, including the disciplinary rules of professional conduct currently articulated in the ABA Model Rules of Professional Conduct, the ABA Model Code of Judicial Conduct, and controlling constitutional decisions and generally accepted principles established in leading federal and state cases and in procedural and evidentiary rules.

An overview of the examination, subject matter outline, and sample questions are provided in the "MPRE Content and Preparation" section of this booklet.

### Jurisdiction Information

The MPRE is required for admission to the bars of all but four U.S. jurisdictions. Since the MPRE requirements vary from one jurisdiction to another, examinees are advised to check with the board of bar examiners in each jurisdiction where admission is being sought before completing the enclosed materials. Passing scores are established by each jurisdiction.

NCBE and its contractor, ACT, take steps to ensure that MPRE registration materials are properly handled and processed, and that exams and answer sheets are properly prepared, printed, handled, and scored. In the unlikely event that a mistake occurs in preparing, handling, processing, scoring, or reporting scores, NCBE will correct the error, if possible, or permit the affected examinee(s) either to retest at no additional fee or to receive a refund of his/her/their examination fee(s). **These remedies are the exclusive remedies available to examinees for errors in preparing, handling, or processing registration materials; in printing, handling, or processing exams and exam answer sheets; or in determining or reporting scores.**

**Copyright Notice**

The Multistate Professional Responsibility Examination
(MPRE™) is owned by the National Conference of Bar
Examiners (NCBE) and is a secure exam protected by U.S.
copyright laws. NCBE strictly prohibits copying, reproduc-
ing, or disclosing any MPRE questions or answers, whether
via electronic, telephonic, written, oral, or other means, to
any party or to any public forum during or after the exam.

NCBE will use every legal means available to protect its
copyrighted materials. Any unauthorized disclosure of the
MPRE's contents could result in civil liability, criminal
penalties, cancellation of test scores, denial of application to
sit for future exams, denial of bar application on character
and fitness grounds, and/or disciplinary actions by bar
authorities.

# MPRE Application Procedures

## Test Dates and Application Deadlines

| Test Date | Regular Application Receipt Deadline | Late Application Receipt Deadline |
|---|---|---|
| March 5, 2011* | January 18, 2011 | February 3, 2011 |
| August 5, 2011 | June 21, 2011 | July 7, 2011 |
| November 5, 2011* | September 20, 2011 | October 6, 2011 |

*The March and November test dates fall on Saturday morning.
An applicant whose religious beliefs preclude him or her from tak-
ing the examination on one of these dates may apply to take the
MPRE on Sunday, March 6, 2011, or Sunday, November 6, 2011.
Requests to take the exam on Sunday must be in writing and must
include a letter from the applicant's cleric confirming the appli-
cant's affiliation with a recognized religious entity that observes
its Sabbath throughout the year on Saturday. **This documentation
must be received by the late receipt deadline** and must be sent
with a copy of the online confirmation received after submission
of an online application or with a completed paper application.
The applicant will be notified whether or not the request is granted.

Online applications must be received by 11:59 p.m. central
time on the published deadline date. Paper applications
must be received in the MPRE Application Department in
Iowa City, Iowa, by 5:00 p.m. central time. **Absolutely no
applications will be accepted after the late application
receipt deadline.**

## Examination Fee

**All fees are nonrefundable and nontransferable.**

For applications received on or before the regular receipt
deadline, the fee for the MPRE is $63. For those who apply
**after** the regular receipt deadline but before the late receipt
deadline, the fee is $126.

4

The application fee entitles the applicant to receive a score report and to have a copy sent to the board of bar examiners of the jurisdiction indicated on the applicant's answer sheet.

Fees for online registration will be calculated automatically based on the date of submission and must be paid with a credit card (MasterCard or VISA only). For applications that are mailed, all fees must be paid in the form of a personal or business check, cashier's check, certified check, or money order, payable in U.S. dollars and drawn on a bank in the United States. Checks should be made payable to the **National Conference of Bar Examiners.** Application materials that include insufficient or improper payment will not be processed.

When you pay by check, you are authorizing ACT, Inc., to convert your check to an electronic entry. You will not receive your check back from your financial institution. If your check is returned to us due to insufficient or uncollected funds, it may be re-presented electronically and your account will be debited.

A $25 fee will be assessed for a check or credit card payment returned because of insufficient funds or stop payment. Scores for the current administration or any future MPRE will not be released until all fees are paid in full.

Applicants who need fee receipts should contact the MPRE Application Department at (319) 341-2500 or at **mpre.registration@act.org**. Fee receipts can only be provided for the current testing year.

**There is no provision for makeup testing.**

### Online Registration

Applicants may register online at **www.act.org/mpre**. An online applicant who successfully submits an application will receive an immediate confirmation screen that should be printed for the applicant's records. An applicant who enters a valid e-mail address will be sent an electronic confirmation within 48 hours of a successful submission of the online application. (In an effort to reduce unwanted e-mail, many Internet service providers use various filtering techniques. Some of these filtering methods may block automatically generated correspondence from **@act.org**. It may be necessary to adjust the filtering settings accordingly.) The applicant will need to keep his or her user name and password, as they will be needed to access the Admission Ticket and score report.

The applicant will be sent an e-mail message providing instructions and a link to access a printable Admission Ticket approximately five weeks before the examination.

5

It is the responsibility of the applicant to contact the MPRE Application Department at (319) 341-2500 or at **mpre.registration@act.org** if there are any difficulties with online access.

NCBE cannot be responsible for online applications that are not successfully submitted or payments that cannot be processed.

**Paper Application**

**Applicants are strongly encouraged to use the online registration.** Applicants who apply by paper application will not be able to access their Admission Tickets or download their score reports online. It is advisable to mail application materials well in advance of the deadline. This will allow time to check on the status of application materials prior to the deadline and, if necessary, to resolve any problems. **NCBE cannot be responsible for materials lost in the mail or payments that cannot be processed.**

Application forms must be completed using a No. 2 pencil or a mechanical pencil with HB lead. In each block, where required, clearly print the needed information in the boxes. Then, in the column below each box containing a letter or number, completely fill in the corresponding oval containing the same letter or number. Below each empty box, fill in the blank oval.

When application materials are received by the MPRE Application Department, they will be checked to ensure that all the necessary information is present. Complete application materials will be processed and an Admission Ticket will be sent via USPS. If application materials do not include the necessary information, they will be returned with an explanatory letter. Corrected application materials that are resubmitted must still meet the published receipt deadline for the test date requested.

For acknowledgment of receipt of application materials, send a self-addressed, stamped postcard with the completed application materials. The card will be returned when the materials are processed. To ensure receipt of late application materials by the late receipt deadline, applicants may wish to send materials by a traceable courier service.

**Admission Ticket**

The Admission Ticket will include the applicant's test date and assigned test center, and a Photo Identification section, which must be completed. The applicant must sign the ticket and attach a recent, representative, 2" x 2" passport-type photo. Digital photographs printed on photo paper will be accepted. Photocopied photographs will not be accepted.

6

It is the responsibility of the applicant to contact the MPRE Application Department at (319) 341-2500 or at **mpre.registration@act.org** if an Admission Ticket has not been received within three weeks of the examination.

### Test Center Locations

On the application form, the applicant must indicate his or her choice of test date and test center, including both the code and the name of the test center where the examination is to be given. A list of test center locations is located in Appendix A. Test centers may change during the year.

### Test Center Assignments

**Test center choices for applicants cannot be guaranteed.** Test center assignments are made on a first-come, first-served basis. We will make every attempt to assign the applicant to his or her first or second choice of test centers; however, if those test centers are at capacity at the time assignments are made, the applicant will be assigned to an available test center as close as possible to his or her choices. **Applicants are advised that travel to another city or state may be required.**

Additional space or a new test center sometimes will be established after most assignments have been made. Applicants who have not yet been assigned to a space are then placed in the new test center.

Occasionally, test centers will be closed **after** test center assignments have been made. It is then necessary to assign those applicants to another test center. At that time, the applicants will be sent new Admission Tickets and an attempt will be made to contact them by phone.

### Change of Test Centers

If an applicant wishes to change test centers after submitting application materials, a change may be requested by contacting the MPRE Application Department at (319) 341-2500. Test center change requests will be considered if time and space permit; however, such changes are solely within the discretion of NCBE. Applicants may request a test center change no later than two weeks prior to the test date.

### Accommodations for Applicants with Disabilities

The National Conference of Bar Examiners provides reasonable testing accommodations for MPRE examinees who have qualified disabilities as defined in the Americans with Disabilities Act (ADA) and who provide appropriate documentation in a timely manner. Information regarding requesting accommodations is located in Appendix B.

7

**Reapplying to Take the Examination**

If an applicant is unable to take the examination on the scheduled test date and wishes to reschedule, or does not attain a passing score on the MPRE and wishes to retake the exam, **the applicant must reapply for another scheduled examination** with all new application materials and pay the full and appropriate fee.

# Test Day Information

All examinees must report to the test center by 9:00 a.m. The examination is 2 hours and 5 minutes in length. Testing will begin as soon as all examinees have been checked in and seated. **Late arrivals will not be admitted.** Beginning and ending testing times may vary depending on the size of the test center and the number of rooms used. Examinees can expect testing to be completed in 2½ to 3½ hours from the reporting time.

NCBE is not responsible if examinees are delayed or unable to reach the test center because of weather or road conditions. In the event of inclement weather (blizzard, flood, hurricane, etc.), listen to local radio or television stations for announcements concerning the status of the test center.

**Admission and Identification**

Each examinee must present a completed test center Admission Ticket in order to be admitted to the test center. If an Admission Ticket is misplaced, the examinee must contact the MPRE Application Department in Iowa City, Iowa, before the test date.

The test center supervisor will inspect each Admission Ticket to verify that it is for the correct test center and date, and that the identification portions of the Admission Ticket are properly completed. Examinees will also be asked for additional photo identification, such as a current (unexpired) driver's license, passport, or school identification card, bearing a photograph and signature. Only examinees who have been positively identified will be admitted to the testing room.

All Admission Tickets and attached photographs will be collected during the admission process on the day of the exam and will become part of examinees' MPRE files. NCBE reserves the right to notify any board of bar examiners if an examinee fails to present an Admission Ticket with a suitable photograph on it and/or if an examinee fails to present an acceptable form of identification that includes a photograph.

8

The examinee must know his or her Social Security number when reporting to the test centers, as this information is requested on the answer sheet. If an examinee does not fill in the corresponding ovals on the answer sheet for his or her Social Security number, he or she may be assigned an identification number for processing and record-keeping purposes. This number will appear on the score report in the space for the Social Security number.

Examinees will not be permitted to select their own seats. The test supervisor will assign seats in the testing room. Access to the testing room will be restricted to test center personnel and examinees.

If an examinee is unable to complete the test due to illness during testing, he or she must return the test booklet and answer sheet to the supervisor, who will mark the answer sheet VOID and indicate on the Testing Irregularity Report that the answer sheet should not be scored. No special testing arrangements can be made. To apply for a subsequent examination, the examinee must submit all new application materials and pay the full and appropriate fee.

## What to Bring

Examinees should bring several No. 2 black lead pencils or mechanical pencils with HB lead to their assigned test center, along with their completed Admission Tickets and proper identification.

## What Not to Bring

Examinees are **not** allowed to bring personal items into MPRE test centers. Cell phones or other electronic devices that are brought into the testing room will be confiscated and may be retained indefinitely. The following are examples of prohibited items:

- cell phones
- earplugs
- pagers
- text messaging devices
- portable media players
- personal digital assistants, handheld computers, or wireless e-mail devices
- audio or video recording devices
- cameras, scanners, or other picture-taking devices
- language translators
- radios or tape recorders
- pens or highlighters
- written materials, such as books or notes
- scratch paper
- calculators
- rulers

- backpacks, purses, or briefcases
- hats or headphones
- watches
- alarms
- food or drink, including water

## Prohibited Behaviors

Test security procedures are designed to ensure that examinees have an equal opportunity to demonstrate their academic achievement and skills, that examinees who do their own work are not unfairly disadvantaged by examinees who do not, and that scores reported for each examinee are valid. The following behaviors are prohibited at test centers:

- attempting to remove test materials or information, including test questions or answers, or any unauthorized items from the testing room during any scheduled or unscheduled break or at the conclusion of the testing period
- looking at another examinee's test booklet or answer sheet
- giving or receiving assistance
- using any device to share or exchange information during the test
- using any unauthorized aids
- creating a disturbance or allowing an alarm, pager, or phone to sound in the testing room
- filling in ovals after time has been called

Examinees may not retain any test materials. Pages or covers of test booklets are not to be torn out of or separated from the test booklets in any way. Examinees are not permitted to duplicate or record, by copying, photographing, or any other means, any part of the MPRE. All test materials, including test booklets and answer sheets, must be returned intact to the test supervisor after testing.

*The MPRE is part of the bar examination requirements of participating jurisdictions and the same standards of conduct by the examinees apply as if the examination were being administered by a board of bar examiners. NCBE reserves the right to report questionable conduct in connection with the MPRE to the appropriate board of bar examiners.*

## Disruptions in Testing and Potential Compromises

NCBE and ACT take steps to ensure standardized administration on the test day. If events occur that cause testing to be cancelled or interrupted, involve a mistiming on any part of the test, result in a deviation from required testing procedures, raise concerns about possible advance access to an exam's content by one or more examinees, and/or

10

otherwise disrupt or compromise the normal testing process or the validity of test scores, NCBE will examine the situation and determine if corrective action is warranted, including score cancellation(s) or nonscoring of answer sheets. If NCBE, in its sole discretion, determines that action is warranted, the affected examinees will be offered the option either to retest at no additional fee or to receive a refund of their examination fees (unless the affected examinees are found to have caused or been involved in the conduct which resulted in the corrective action, in which event NCBE shall have the right to withhold either or both of these options). If NCBE offers a retest and an examinee selects that option, the examinee must retake the entire exam in order to produce a valid score.

**Test Center Review**

At the end of the examination, examinees will be given the opportunity to assess testing conditions by completing a Test Center Review section in the examination booklet. The responses provided are used to monitor and improve testing conditions and procedures for future administrations of the MPRE. Responses to the Test Center Review do not affect the test score.

Written complaints about testing conditions or procedures must be received at ACT within four weeks of the test date. Concerns may be detailed in an e-mail to **TestACT@act.org** or a letter to:

> National Conference of Bar Examiners
> MPRE Test Administration
> 301 ACT Drive
> P.O. Box 168
> Iowa City, IA 52243-0168

# MPRE Scores

**Scoring Process**

The MPRE scaled score is a standard score. Standard scaled scores range from 50 (low) to 150 (high). The mean (average) scaled score was established at 100, based upon the performance of the examinees who took the MPRE in March 1999.

The conversion of raw scores to scaled scores involves a statistical process that adjusts for variations in the difficulty of different forms of the examination so that any particular scaled score will represent the same level of knowledge from test to test. For instance, if a test is more difficult than previous tests, then the scaled scores on that test will be adjusted upward to account for this difference.

11

If a test is easier than previous tests, then the scaled scores on the test will be adjusted downward to account for this difference. The purpose of these adjustments is to help ensure that no examinee is unfairly penalized or rewarded for taking a more or less difficult form of the test.

### Score Reports

An MPRE score report will be released to the examinee and sent to the jurisdiction requested on the answer sheet within five weeks of the examination date. Results will also be kept on file with ACT in Iowa City, Iowa. The score report includes the examinee's scaled score and the jurisdiction, if any, that the examinee requested to receive the score. If an examinee did not request on test day that his or her score be sent to a jurisdiction, no indication will appear on the score report. If the examinee wishes to send his or her score report to a jurisdiction at a later date, an additional fee will be charged.

An examinee who registered online and provided a valid e-mail address will be sent instructions and a link to access a printable version of his or her score report. Score reports are available only until the late receipt deadline of the following test date. Examinees are advised to save the file for future reference.

An examinee who registered by paper application will be sent his or her score report via USPS.

It is the responsibility of the examinee to contact MPRE Records at (319) 337-1304 or at **mpre.score@act.org** if he or she encounters difficulties with online access or does not receive the score report within five weeks of the examination.

### Additional Score Reports

Additional score reports are available after the examination for a fee of $15 per report. A score report request form is available at **www.ncbex.org** and on page 13 of this booklet. Requests should be sent to:

> National Conference of Bar Examiners
> MPRE Records
> 101 ACT Drive
> P.O. Box 4001
> Iowa City, IA 52243-4001

## Additional MPRE Score Report(s) Request Form
*ALL INFORMATION REQUIRED—PRINT CAREFULLY*

Name: _____

Address: _____

_____

City: _____

State: _____ ZIP code: _____

Daytime phone: _____

E-mail: _____

Social Security number: _____

Date of birth: _____

MPRE date: YEAR_____
    ❏ March ❏ August ❏ November

If the actual test date is not known, provide an approximate
date (mo/yr) _____

Send an MPRE score report to the following jurisdictions ($15
fee per jurisdiction):

_____

_____

_____

Send an MPRE score report stamped "unofficial" to me ($15
fee): ❏ Yes ❏ No

Signature:_____

Date:_____

**Enclose $15 for each score requested.** Checks should be made
payable to the National Conference of Bar Examiners. Mail to:
    National Conference of Bar Examiners
    MPRE Records
    101 ACT Drive
    P.O. Box 4001
    Iowa City, IA 52243-4001

**An applicant to the District of Columbia (DC)** should not
request transfer of his or her MPRE score to DC. Instead, the
applicant must provide DC with a copy of his or her unoffi-
cial MPRE score report when filing an application to DC.

When you pay by check, you are authorizing ACT, Inc., to
convert your check to an electronic entry. You will not receive
your check back from your financial institution. If your check
is returned to us due to insufficient or uncollected funds, it may
be re-presented electronically and your account will be debited.

If you have any questions concerning MPRE scores, you may
call (319) 337-1304. (TDD for persons with hearing impair-
ments (319) 337-1701; must call from a TDD.)

**Cancellation of Scores by NCBE**

NCBE reserves the right to cancel test scores when there is reason to believe the scores are invalid. Cases of testing irregularities—such as falsification of one's identity, impersonation of another examinee (surrogate testing), unusual similarities in the answers of examinees, or other indicators that the test scores may not be valid—may result in the cancellation of test scores. When NCBE decides to cancel test scores, it notifies the examinees before taking that action (except in cases of testing disruptions or compromises discussed above). The notice includes information about the options available regarding the planned score cancellation, including procedures for appealing the cancellation decision. In any such appeal, the issue to be decided is whether NCBE acted reasonably and in good faith in deciding to cancel the score(s).

**Requests for Rechecking of Answer Sheets**

A request to have an answer sheet rechecked must be made in writing within three months of the original test date. Results from rechecking an answer sheet may take six to eight weeks to become available. The request must include the exact name under which the examinee tested, address, Social Security number, date of birth, test date, and signature. Requests should be sent to:

> National Conference of Bar Examiners
> MPRE Records
> 101 ACT Drive
> P.O. Box 4001
> Iowa City, IA 52243-4001

# MPRE Content and Preparation

**Overview of the Examination**

The purpose of the MPRE is to measure the examinee's knowledge and understanding of established standards related to a lawyer's professional conduct; the MPRE is not a test to determine an individual's personal ethical values. Lawyers serve in many capacities: for example, as judges, advocates, counselors, and in other roles. The law governing the conduct of lawyers in these roles is applied in disciplinary and bar admission procedures, and by courts in dealing with issues of appearance, representation, privilege, disqualification, and contempt or other censure, and in lawsuits seeking to establish liability for malpractice and other civil or criminal wrongs committed by a lawyer while acting in a professional capacity.

14

The MPRE is developed by a six-member drafting committee composed of recognized experts in the area of professional responsibility. Before a test question is selected for inclusion in the MPRE, it undergoes a multistage review process that occurs over the course of several years before the test is administered. Besides intensive review by the drafting committee and testing specialists, each test question is reviewed by other national and state experts. All test questions must successfully pass all reviews before they are included in the MPRE. After an MPRE is administered, the statistical performance of each test question is reviewed and evaluated by content and testing experts before the questions are included in the computation of examinees' scores. This final statistical review is conducted to ensure that each test question is accurate and psychometrically sound.

The MPRE consists of 60 multiple-choice questions. There are 50 scored questions and 10 nonscored pretest questions. Since the pretest questions are indistinguishable from those that are scored, it is important that examinees answer all questions in the examination. These questions are followed by 10 Test Center Review items that request the examinee's reactions to the testing conditions and other aspects of the testing process. The examinee will have two hours and five minutes in which to answer these questions.

Test questions covering judicial ethics apply the current ABA Model Code of Judicial Conduct (CJC). Other questions will deal with discipline of lawyers by state disciplinary authorities; in these questions, the correct answer will be governed by the current ABA Model Rules of Professional Conduct (MRPC). The remaining questions, outside the disciplinary context, are designed to measure an understanding of the generally accepted rules, principles, and common law regulating the legal profession in the United States; in these questions, the correct answer will be governed by the view reflected in a majority of cases, statutes, or regulations on the subject. To the extent that questions of professional responsibility arise in the context of procedural or evidentiary issues, such as the availability of litigation sanctions or the scope of the attorney-client evidentiary privilege, the Federal Rules of Civil Procedure and the Federal Rules of Evidence will be assumed to apply, unless otherwise stated.

As a general rule, particular local statutes or rules of court will not be tested in the MPRE. However, a specific question may include the text of a local statute or rule that must be considered when answering that question. Amendments

15

to the MRPC or the CJC will be reflected in the examination no earlier than one year after the approval of the amendments by the American Bar Association.

Each question contained in the MPRE provides a factual situation along with a specific question and four possible answer choices. The examinee should choose the best answer from the four stated options. The examinee should mark only one answer for each question; multiple answers will be scored as incorrect. Since scores are based on the number of questions answered correctly, the examinee is advised to answer every question. If a question seems too difficult, the examinee is advised to go on to the next one and come back to the skipped question later. Each question may include, among others, one of the following words or phrases:

1. "Subject to discipline" asks whether the conduct described in the question would subject the lawyer to discipline under the provisions of the ABA Model Rules of Professional Conduct. In the case of a judge, the test question asks whether the judge would be subject to discipline under the ABA Model Code of Judicial Conduct.

2. "May" or "proper" asks whether the conduct referred to or described in the question is professionally appropriate in that it
   a. would not subject the lawyer or judge to discipline; and
   b. is not inconsistent with the Preamble, Comments, or text of the ABA Model Rules of Professional Conduct or the ABA Model Code of Judicial Conduct; and
   c. is not inconsistent with generally accepted principles of the law of lawyering.

3. "Subject to litigation sanction" asks whether the conduct described in the question would subject the lawyer or the lawyer's law firm to sanction by a tribunal such as fine, fee forfeiture, disqualification, punishment for contempt, or other sanction.

4. "Subject to disqualification" asks whether the conduct described in the question would subject the lawyer or the lawyer's law firm to disqualification as counsel in a civil or criminal matter.

5. "Subject to civil liability" asks whether the conduct described in the question would subject the lawyer or the lawyer's law firm to civil liability, such as claims arising from malpractice, misrepresentation, or breach of fiduciary duty.

16

6. "Subject to criminal liability" asks whether the conduct described in the question would subject the lawyer to criminal liability for participation in or for aiding and abetting criminal acts, such as prosecution for insurance or tax fraud, destruction of evidence, or obstruction of justice.

7. When a question refers to discipline by the "bar," "state bar," or "state disciplinary authority," it refers to the appropriate agency in the jurisdiction with authority to administer the standards for admission to practice and for maintenance of professional competence and integrity. Whenever a lawyer is identified as a "certified specialist," that lawyer has been so certified by the appropriate agency in the jurisdiction in which the lawyer practices. The phrases "informed consent" and "consent after consultation" are to be interpreted as having the same meaning.

## Subject Matter Outline

The following subject matter outline indicates the 2011 MPRE's scope of coverage and the approximate percentage of items that are included in each major area. The outline is not intended to list every aspect of a topic mentioned. Although the test items for each MPRE are developed from these categories, each topic is not necessarily tested on each examination.

    I. Regulation of the Legal Profession (6–12%)
        A. Powers of Courts and Other Bodies to Regulate Lawyers
        B. Admission to the Profession
        C. Regulation after Admission—Lawyer Discipline
        D. Mandatory and Permissive Reporting of Professional Misconduct
        E. Unauthorized Practice of Law—by Lawyers and Nonlawyers
        F. Multi-jurisdictional Practice
        G. Fee Division with a Nonlawyer
        H. Law Firm and Other Forms of Practice
        I. Responsibilities of Partners, Managers, Supervisory and Subordinate Lawyers
        J. Restrictions on Right to Practice
    II. The Client-Lawyer Relationship (10–16%)
        A. Formation of Client-Lawyer Relationship
        B. Scope, Objective, and Means of the Representation
        C. Decision-making Authority—Actual and Apparent
        D. Counsel and Assistance Within the Bounds of the Law

17

          E. Termination of the Client-Lawyer Relationship

          F. Client-Lawyer Contracts

          G. Communications with the Client

          H. Fees

III. Client Confidentiality (6–12%)

          A. Attorney-Client Privilege

          B. Work Product Doctrine

          C. Professional Obligation of Confidentiality—General Rule

          D. Disclosures Expressly or Impliedly Authorized by Client

          E. Other Exceptions to the Confidentiality Rule

IV. Conflicts of Interest (12–18%)

          A. Current Client Conflicts—Multiple Clients and Joint Representation

          B. Current Client Conflicts—Lawyer's Personal Interest or Duties

          C. Former Client Conflicts

          D. Prospective Client Conflicts

          E. Imputed Conflicts

          F. Acquiring an Interest in Litigation

          G. Business Transactions with Clients

          H. Third Party Compensation and Influence

          I. Lawyers Currently or Formerly in Government Service

          J. Former Judge, Arbitrator, Mediator, or Other Third Party Neutral

 V. Competence, Legal Malpractice, and Other Civil Liability (6–12%)

          A. Maintaining Competence

          B. Competence Necessary to Undertake Representation

          C. Exercising Diligence and Care

          D. Civil Liability to Client, Including Malpractice

          E. Civil Liability to Nonclients

          F. Limiting Liability for Malpractice

          G. Malpractice Insurance and Risk Prevention

VI. Litigation and Other Forms of Advocacy (10–16%)

          A. Meritorious Claims and Contentions

          B. Expediting Litigation

          C. Candor to the Tribunal

          D. Fairness to Opposing Party and Counsel

          E. Impartiality and Decorum of the Tribunal

          F. Trial Publicity

          G. Lawyer as Witness

VII. Transactions and Communications with Persons Other than Clients (2–8%)
    A. Truthfulness in Statements to Others
    B. Communications with Represented Persons
    C. Communications with Unrepresented Persons
    D. Respect for Rights of Third Persons

VIII. Different Roles of the Lawyer (4–10%)
    A. Lawyer as Advisor
    B. Lawyer as Evaluator
    C. Lawyer as Negotiator
    D. Lawyer as Arbitrator, Mediator, or Other Third Party Neutral
    E. Prosecutors and Other Government Lawyers
    F. Lawyer Appearing in Nonadjudicative Proceeding
    G. Lawyer Representing an Entity or Other Organization

IX. Safekeeping Funds and Other Property (2–8%)
    A. Establishing and Maintaining Client Trust Accounts
    B. Safekeeping Funds and Other Property of Clients
    C. Safekeeping Funds and Other Property of Third Persons
    D. Disputed Claims

X. Communications about Legal Services (4–10%)
    A. Advertising and Other Public Communications about Legal Services
    B. Solicitation—Direct Contact with Prospective Clients
    C. Group Legal Services
    D. Referrals
    E. Communications Regarding Fields of Practice and Specialization

XI. Lawyers' Duties to the Public and the Legal System (2–4%)
    A. Voluntary Pro Bono Service
    B. Accepting Appointments
    C. Serving in Legal Services Organizations
    D. Law Reform Activities Affecting Client Interests
    E. Criticism of Judges and Adjudicating Officials
    F. Political Contributions to Obtain Engagements or Appointments
    G. Improper Influence on Government Officials
    H. Assisting Judicial Misconduct

19

XII. Judicial Conduct (2–8%)
   A. Maintaining the Independence and Impartiality of the Judiciary
   B. Performing the Duties of Judicial Office Impartially, Competently, and Diligently
   C. Ex Parte Communications
   D. Disqualification
   E. Extrajudicial Activities

**Test Preparation**

Students who have taken and reviewed a two- or three-credit law school survey course in Professional Responsibility should be reasonably well prepared to take the MPRE. However, for those wishing to engage in additional preparation, there are numerous sources available for consultation, including the American Bar Association's Annotated Model Rules of Professional Conduct and the American Law Institute's Restatement of the Law Governing Lawyers, as well as treatises collecting and discussing the authorities.

The ABA Model Rules of Professional Conduct and the ABA Model Code of Judicial Conduct are available from the American Bar Association Service Center at 321 North Clark Street, Chicago, IL 60610, (312) 988-5522 or (800) 285-2221. The website at which these publications may be purchased is **www.abanet.org/abastore**.

The MPRE Online Practice Exam 1 (MPRE-OPE 1) is a 60-question, annotated online practice exam. Purchasing the MPRE-OPE 1 gives an examinee a subscription for online access to the practice exam, for unlimited trials, expiring one year after the date of purchase. Examinees can take the practice exams timed or untimed and receive feedback on their answers. The practice exam is available only online.

# MPRE Sample Questions

This section provides examples of test questions similar to those contained in the MPRE. Read and answer them to familiarize yourself with the kinds of questions found on the examination. The answer key is located on page 36.

Question 1.

An attorney represented the wife in an acrimonious divorce proceeding involving issues of property division and child custody. After one day of trial, the husband, through his lawyer, made a settlement offer. The proposed settlement required that the wife's attorney agree not to represent the wife in any subsequent proceeding, brought by either party, to modify or enforce the provisions of the decree. The wife wanted to accept the offer, and her attorney reasonably believed that it was in the wife's best interest to do so because the settlement offer was better than any potential award to the wife resulting from the case going to judgment. Consequently, the attorney recommended to the wife that she accept the offer.

Was it proper for the wife's attorney to recommend that the wife accept the settlement offer?

A.  No, because the attorney did not obtain the wife's informed consent to the conflict of interest created by the proposed settlement.

B.  No, because the proposed settlement restricted the attorney's right to represent the wife in the future.

C.  Yes, because the restriction on the attorney was limited to subsequent proceedings in the same matter.

D.  Yes, because the attorney reasonably believed that it was in the wife's best interest to accept the proposed settlement.

21

Question 2.

An experienced oil and gas developer asked an attorney to represent him in a suit to establish the developer's ownership of certain oil and gas royalties. The developer did not have available the necessary funds to pay the attorney's reasonable hourly rate for undertaking the case and proposed instead that, if he prevailed in the lawsuit, he would pay the attorney 20% of the first year's royalties recovered in the suit. Twenty percent of the first year's royalties would likely exceed the amount that the attorney would have received from charging his regular hourly rate. The attorney accepted the proposal.

Is the attorney subject to discipline?

A.  Yes, because the agreement gave the attorney a proprietary interest in the developer's cause of action.

B.  Yes, because the fee was likely to exceed the amount that the attorney would have received from charging his regular hourly rate.

C.  No, because the developer rather than the attorney proposed the fee arrangement.

D.  No, because the attorney may contract with the developer for a reasonable contingent fee.

22

Question 3.

An attorney represents a company that produces chemical products. Some of the waste products of the company's manufacturing processes are highly toxic and are reasonably certain to cause substantial bodily harm if disposed of improperly. The president of the company recently informed the attorney that a new employee mistakenly disposed of the waste products in the ground behind the company plant, an area that is part of the source of the city's water supply. The attorney advised the president that, although the conduct was not criminal, the company could be civilly liable for negligence in lawsuits brought by any persons harmed by the waste products. The attorney advised the president to immediately report the problem to city authorities. Fearful of adverse publicity, the president declined to do so. The attorney further advised the president that she believed the president's decision was immoral. The president continued to decline to report the matter. The attorney then informed the president that she was withdrawing from the representation and would inform the authorities herself. Immediately after withdrawing, the attorney reported the company's conduct to the authorities.

Is the attorney subject to discipline?

A.  Yes, because the information was given to the attorney in confidence and may not be revealed without the client's consent.
B.  Yes, because the company's conduct was not criminal.
C.  No, because the attorney reasonably believed that the company's disposal of the waste products was reasonably certain to cause substantial bodily harm.
D.  No, because the attorney reasonably believed that the president was pursuing an imprudent course of conduct.

23

Question 4.

An attorney, a member of the state legislature, is allowed to engage in private practice under state law. The attorney represents a plaintiff in a personal injury case. The attorney reasonably believes that the trial of the case will last at least two weeks. When the case was first scheduled for trial, the attorney requested a continuance, truthfully stating, "As the court knows, I am a member of the legislature, which will be going into special session next week. Because of my legislative duties, I must be in the state capitol for the duration of the session." The continuance did not give the plaintiff any advantage in the litigation. The defendant objected to the continuance, but the court granted it.

Is the attorney subject to discipline?

A.  No, because the attorney's statements to the court were truthful.
B.  No, because the continuance did not give the plaintiff any advantage in the litigation.
C.  Yes, because the defendant objected to the continuance.
D.  Yes, because the attorney used her public position to influence a tribunal.

Question 5.

An attorney worked in the legal department of a public utility company and represented that company in litigation. The company was sued by a consumer group which alleged that the company was guilty of various acts in violation of its charter. Through its general counsel, the company instructed the attorney not to negotiate a settlement but to go to trial under any circumstances since a precedent needed to be established. Although the company's defense could be supported by a good faith argument, the attorney believed that the case should be settled if possible.

Must the attorney withdraw as counsel in this case?

A.  No, because as an employee, the attorney is bound by the instructions of the general counsel.
B.  No, because the company's defense can be supported by a good faith argument.
C.  Yes, because a lawyer should endeavor to avoid litigation.
D.  Yes, because the company is controlling the attorney's judgment in settling the case.

24

Question 6.

An attorney represented a client who was the plaintiff in a personal injury action. The personal injury action was settled, and the attorney received a check in the amount of $10,000 payable to the attorney. The attorney deposited the check in her clients' trust account.

One day later, the attorney received a letter from a bank, which had heard of the settlement of the personal injury lawsuit. The bank informed the attorney that the client had failed to make his monthly mortgage payments for the last three months and demanded that the attorney immediately release $900 of the proceeds of the settlement to the bank or the bank would institute mortgage foreclosure proceedings against the client. The attorney informed the client of the bank's letter. The client did not dispute the $900 debt to the bank, but responded:

"I don't care what the bank does. The property is essentially worthless, so let the bank foreclose. If the bank wants to sue me, I'll be easy enough to find. I don't think they'll even bother. You just take your legal fees and turn the rest of the proceeds over to me."

Is the attorney subject to discipline if she follows the client's instructions?

A. Yes, because the client did not dispute the $900 debt to the bank.

B. Yes, because the attorney knows that the client is planning to force the bank to sue him.

C. No, because the attorney did not represent the client in the mortgage matter.

D. No, because the bank has no established right to the specific proceeds of the client's personal injury judgment.

25

Question 7.

An attorney represented a client in an action against the client's former business partner to recover damages for breach of contract. During the representation, the client presented the attorney with incontrovertible proof that the partner had committed perjury in a prior action that was resolved in the partner's favor. Neither the attorney nor the client was involved in any way in the prior action. The attorney believes that it would be detrimental to the client's best interests to reveal the perjury because implications might be drawn from the former close personal and business relationship between the client and the partner.

Is it proper for the attorney to disclose the perjury to the tribunal?

A.  No, because the attorney believes that the disclosure would be detrimental to the client's best interests.

B.  No, because neither the client nor the attorney was involved in the prior action.

C.  Yes, because the attorney has knowledge that the partner perpetrated a fraud on the tribunal.

D.  Yes, because the information is unprivileged.

Question 8.

An attorney was engaged under a general retainer agreement to represent a corporation involved in the uranium industry. Under the agreement, the attorney handled all of the corporation's legal work, which typically involved regulatory issues and litigation.

The corporation told the attorney that a congressional committee was holding hearings concerning the extent of regulation in the copper industry. Because the corporation was considering buying a copper mine during the next fiscal year, the corporation asked the attorney to appear and testify that the industry was overregulated. The attorney subsequently testified to that effect before the relevant congressional committee. The attorney registered his appearance under his own name and did not disclose that he was appearing on behalf of a client. Afterward, the attorney billed the corporation for fees and expenses related to his testimony. The attorney's testimony was truthful.

Was the attorney's conduct proper?

A.  Yes, because the duty of confidentiality prevented the attorney from disclosing the identity of his client.

B.  Yes, because the attorney-client evidentiary privilege prevented disclosure of the identity of his client in this context.

C.  No, because the attorney failed to disclose that he was appearing and testifying in a representative capacity.

D.  No, because the attorney accepted compensation in return for his testimony.

Question 9.

An attorney represented a plaintiff in a civil suit against a defendant, who was also represented by a lawyer. In the course of developing the plaintiff's case, the attorney discovered evidence that she reasonably believed showed that the defendant had committed a crime. The attorney felt that the defendant's crime should be reported to local prosecutorial authorities. After full disclosure, the plaintiff consented to the attorney's doing so. Without advising the defendant's lawyer, the attorney informed the local prosecutor of her findings, but she sought no advantage in the civil suit from her actions. The defendant was subsequently indicted, tried, and acquitted of the offense.

Was the attorney's disclosure to prosecutorial authorities proper?

A.  Yes, because the attorney reasonably believed that the defendant had committed a crime.
B.  Yes, because the attorney was required to report unprivileged knowledge of criminal conduct.
C.  No, because the attorney did not know that the defendant had committed a crime.
D.  No, because the plaintiff's civil suit against the defendant was still pending.

28

Question 10.

A law firm has 300 lawyers in 10 states. It has placed the supervision of all routine administrative and financial matters in the hands of a nonlawyer administrator. The administrator is paid a regular monthly salary and a year-end bonus of 1% of the law firm's net income from fees. Organizationally, the administrator reports to the managing partner of the law firm. This partner deals with all issues related to the law firm's supervision of the practice of law. The administrator has access to client files but does not have control over the professional judgment of the lawyers in the firm.

Is it proper for the partner to participate in the law firm's use of the administrator's services in this fashion?

A.  No, because the administrator has access to client files.
B.  No, because the law firm is assisting a nonlawyer in the unauthorized practice of law.
C.  No, because the law firm is sharing legal fees with a nonlawyer.
D.  Yes, because the administrator does not control the professional judgment of the lawyers in the firm.

Question 11.

An attorney who had represented a client for many years prepared the client's will and acted as one of the two subscribing witnesses to its execution. The will gave 10% of the client's estate to the client's housekeeper, 10% to the client's son and sole heir, and the residue to charity. Upon the client's death one year later, the executor named in the will asked the attorney to represent him in probating the will and administering the estate. At that time, the executor informed the attorney that the son had notified him that he would contest the probate of the will on the grounds that the client lacked the required mental capacity at the time the will was executed. The attorney believes that the client was fully competent at all times and will so testify, if called as a witness. The other subscribing witness to the client's will predeceased the client.

Is it proper for the attorney to represent the executor in the probate of the will?

A. Yes, because the attorney is the sole surviving witness to the execution of the will.

B. Yes, because the attorney's testimony will support the validity of the will.

C. No, because the attorney will be called to testify on a contested issue of fact.

D. No, because the attorney will be representing an interest adverse to the interests of the client's heir.

Question 12.

An attorney has experienced several instances in which clients failed to pay their fees in a timely manner when it was too late in the representation to withdraw without prejudicing the clients. To avoid a recurrence of this situation, the attorney has drafted a stipulation of consent to withdraw if fees are not paid according to the fee agreement. She proposes to have all clients sign the stipulation at the outset of the representation. Clients will be provided an opportunity to seek independent legal advice before signing the stipulation.

Is it proper for the attorney to use the stipulation to withdraw from representation whenever a client fails to pay fees?

A.  Yes, because a lawyer may withdraw when the financial burden of continuing the representation would be substantially greater than the parties anticipated at the time of the fee agreement.

B.  Yes, because the clients will have consented to the withdrawal in the stipulation.

C.  Yes, because clients will be provided an opportunity to seek independent legal advice before signing the stipulation.

D.  No, because a client's failure to pay fees when due may be insufficient in itself to justify withdrawal.

31

Question 13.

An attorney was retained by a defendant to represent him in a paternity suit. The defendant's aunt believed the suit was unfounded and motivated by malice. The aunt sent the attorney a check for $1,000 and asked the attorney to apply it toward payment of the defendant's fee. The aunt told the attorney not to tell the defendant of the payment because "[the defendant] is too proud to accept gifts, but I know he really needs the money." The attorney agreed to follow the aunt's instructions, under the condition that the aunt not attempt to influence the attorney's conduct in the case. The attorney reduced what he would normally charge the defendant by $1,000.

Was it proper for the attorney to accept the aunt's check?

A. Yes, because the attorney informed the aunt that she must not attempt to influence the attorney's conduct of the case.
B. Yes, because the attorney reduced what he would normally charge the defendant.
C. No, because the aunt was attempting to finance litigation to which she was not a party.
D. No, because the attorney did not inform the defendant and obtain the defendant's consent to retain the payment.

32

Question 14.

An attorney has a highly efficient staff of para-professional legal assistants, all of whom are graduates of recognized legal assistant educational programs. Recently, the statute of limitations ran against a client's claim when a legal assistant negligently misplaced the client's file and suit was not filed within the time permitted by law.

Which of the following correctly states the attorney's professional responsibility?

A.  The attorney is subject to civil liability and is also subject to discipline on the theory of respondeat superior.

B.  The attorney is subject to civil liability or is subject to discipline at the client's election.

C.  The attorney is subject to civil liability but is NOT subject to discipline unless the attorney failed to adequately supervise the legal assistant.

D.  The attorney is NOT subject to civil liability and is NOT subject to discipline if the attorney personally was not negligent.

33

Question 15.

An attorney is a general practitioner with extensive experience in personal injury litigation. The attorney has also handled legal malpractice cases, but does not hold herself out to be experienced in such cases. A man contacted the attorney by telephone and asked her to represent him in a legal malpractice case that he wanted to file against the lawyer who had handled his divorce. The attorney refused even to meet with the man, saying that she was troubled by how high malpractice insurance premiums were getting and was not going to take any new legal malpractice cases. She did not offer to refer the man to other lawyers who took legal malpractice cases.

The man tried to contact several other lawyers, each of whom indicated that he or she would be happy to accept the representation but was too busy to take on any new matters. Six months later the statute of limitations expired without the man filing his lawsuit.

If the man can establish that a legal malpractice action against the divorce lawyer would have succeeded, is the attorney subject to civil liability for refusing to accept the representation?

A.  Yes, because the attorney did not have good cause to refuse the representation.
B.  Yes, because the attorney did not make reasonable efforts to find a competent lawyer to represent the man.
C.  No, because the attorney does not hold herself out as experienced in legal malpractice cases.
D.  No, because the attorney had no legal obligation to accept the man's case.

34

Question 16.

An attorney and her client entered into a written retainer and hourly fee agreement requiring the client to pay $5,000 in advance of any services rendered by the attorney and requiring the attorney to return any portion of the $5,000 that was not earned. The agreement further provided that the attorney would render monthly statements and withdraw her fees as billed. The agreement was silent as to whether the $5,000 advance was to be deposited in the attorney's clients' trust account or in a general account. The attorney deposited the $5,000 in her clients' trust account, which also contained funds that had been entrusted to the attorney by other persons. Thereafter, the attorney sent the client periodic accurate billings, showing the services rendered and the balance of the client's fee advance. The attorney did not withdraw any of the $5,000 advance until one year later when the matter was concluded to the client's complete satisfaction. At that time, the attorney had billed the client reasonable legal fees of $4,500. The attorney wrote two checks on her clients' trust account: one to herself for $4,500, which she deposited in her general office account, and one for $500 to the client.

Was the attorney's conduct proper?

A.   Yes, because the attorney deposited the funds in her clients' trust account.
B.   Yes, because the attorney rendered periodic and accurate billings.
C.   No, because the attorney's failure to withdraw her fees as billed resulted in an impermissible commingling of her funds and the client's funds.
D.   No, because the attorney required an advance payment against her fee.

35

Question 17.

A wife retained an attorney to advise her in negotiating a separation agreement with her husband. Even though he knew that his wife was represented by the attorney, the husband, who was not a lawyer, refused to obtain counsel and insisted on acting on his own behalf throughout the protracted negotiations. The attorney never met or directly communicated in any way with the husband during the entire course of the negotiations. After several months, the wife advised the attorney that the parties had reached agreement and presented the attorney with the terms. The attorney then prepared a proposed agreement that contained all of the agreed-upon terms.

The attorney mailed the proposed agreement to the husband, with a cover letter stating the following:

"As you know, I have been retained by your wife to represent her in this matter. I enclose two copies of the separation agreement negotiated by you and your wife. Please read it and, if it meets with your approval, sign both copies before a notary and return them to me. I will then have your wife sign them and furnish you with a fully executed copy."

Is the attorney subject to discipline?

A. Yes, because the attorney did not suggest that the husband seek the advice of independent counsel before signing the agreement.
B. Yes, because the attorney directly communicated with an unrepresented person.
C. No, because the attorney acted only as a scrivener.
D. No, because the attorney's letter did not imply that the attorney was disinterested.

**Answer Key**

| 1. B | 6. D | 11. C | 16. C |
|------|------|-------|-------|
| 2. D | 7. A | 12. D | 17. D |
| 3. C | 8. C | 13. D | |
| 4. A | 9. A | 14. C | |
| 5. B | 10. D | 15. D | |

# Appendix A: Test Center Locations and Codes

## Test Center Codes for 2011

National Conference of Bar Examiners
Multistate Professional Responsibility Examination

| MAR | AUG | NOV | CODE | |
|---|---|---|---|---|
| | | | | **ALABAMA** |
| X | | | 0047 | Birmingham, Jefferson State Comm Coll—Carson Rd |
| X | X | X | 0056 | Birmingham, University of Alabama at Birmingham |
| X | X | X | 0003 | Montgomery, Faulkner University |
| X | | X | 0052 | Tuscaloosa, University of Alabama |
| | | | | **ALASKA** |
| X | X | X | 5005 | Anchorage, Alaska Pacific University |
| X | X | X | 6995 | Fairbanks, University of Alaska Fairbanks |
| X | X | X | 0153 | Juneau, University of Alaska Southeast |
| | | | | **ARIZONA** |
| X | | X | 0092 | Phoenix, Grand Canyon University |
| X | | X | 0094 | Phoenix, Phoenix College |
| X | | X | 0088 | Tempe, Arizona State University |
| X | X | X | 0096 | Tucson, University of Arizona |
| | | | | **ARKANSAS** |
| X | X | X | 0144 | Fayetteville, University of Arkansas |
| X | X | X | 0132 | Little Rock, Univ of Arkansas at Little Rock |
| | | | | **CALIFORNIA** |
| X | | X | 0238 | Alameda, College of Alameda |
| X | | X | 0159 | Folsom, Folsom Lake College |
| X | X | X | 4598 | La Jolla, University of California–San Diego |
| | X | | 9623 | Lakewood, Centre at Sycamore Plaza |
| X | | X | 4500 | Long Beach, Long Beach City College |
| X | | X | 0320 | Los Angeles, California State Univ–Los Angeles |
| | X | X | 0387 | Los Angeles, Southwestern Law School |
| | X | | 6001 | Los Angeles, The Westin Los Angeles Airport |
| X | X | X | 0448 | Los Angeles, University of California at Los Angeles |
| X | X | X | 0470 | Los Angeles, University of Southern California |
| X | X | X | 9700 | Los Angeles, Westin Bonaventure Hotel |
| X | X | X | 9805 | Oakland, Alameda County Training & Ed Ctr |
| X | X | X | 1596 | Sacramento, California State Univ–Sacramento |
| X | X | X | 0398 | San Diego, San Diego State University |
| X | X | | 3366 | San Marcos, Palomar College |
| X | | X | 9087 | San Mateo, San Mateo County Expo Center |
| X | X | X | 9962 | Union City, Crowne Plaza |
| X | X | X | 0006 | Walnut Creek, Marriott Walnut Creek |
| | | | | **COLORADO** |
| X | X | | 0532 | Boulder, University of Colorado at Boulder |
| X | X | X | 9959 | Denver, Crowne Plaza Denver Intl Airport |
| | | | | **CONNECTICUT** |
| X | | X | 0564 | Bridgeport, Bridgeport Holiday Inn |
| X | X | X | 0593 | New Haven, Southern Connecticut State Univ |
| | | | | **DELAWARE** |
| X | X | X | 9916 | Wilmington, Widener Univ School of Law |
| | | | | **DISTRICT OF COLUMBIA** |
| X | X | X | 0648 | Washington, American Univ–Wash Coll of Law |
| X | | X | 0674 | Washington, Howard University |
| | | | | **FLORIDA** |
| X | X | X | 0758 | Gainesville, University of Florida |
| X | X | X | 0740 | Jacksonville, Jacksonville University |
| X | X | X | 9601 | Miami, Miami Airport Marriott |
| X | X | X | 0767 | Miami, Miami Dade College–North Campus |
| X | X | X | 5013 | Ocala, College of Central Florida |
| X | | X | 0731 | Saint Petersburg, Eckerd College |
| X | X | X | 0734 | Tallahassee, Florida State University |
| | X | | 6002 | Tampa, Alltano Conference and Banquet Ctr |
| X | | X | 0732 | Tampa, University of South Florida |

37

| MAR | AUG | NOV | CODE | |
|-----|-----|-----|------|--|
| | | | | **GEORGIA** |
| X | X | X | 0872 | Athens, University of Georgia |
| X | X | X | 0826 | Atlanta, Georgia State University |
| X | X | X | 8270 | Atlanta, Herzing College |
| X | X | X | 0638 | Macon, Mercer University |
| X | X | X | 0845 | Marietta, Life University |
| | | X | 0828 | Milledgeville, Georgia College and State Univ |
| | | | | **IDAHO** |
| X | X | X | 0917 | Boise, Boise State University |
| X | X | | 0916 | Caldwell, The College of Idaho |
| X | X | X | 0928 | Moscow, University of Idaho |
| | | | | **ILLINOIS** |
| X | X | X | 1144 | Carbondale, Southern Illinois Univ–Carbondale |
| X | X | X | 1015 | Champaign, Parkland College |
| X | X | X | 1154 | Champaign, Univ of Illinois–Urbana Champaign |
| X | X | X | 9052 | Chicago, Courtyard Marriott Magnificent Mile |
| X | X | X | 9553 | Chicago, Doubletree Hotel Magnificent Mile |
| X | X | X | 1156 | Chicago, Kennedy King College |
| X | X | X | 9015 | Chicago, McCormick Place |
| X | | X | 1010 | Danville, Danville Area Community College |
| X | X | X | 1102 | De Kalb, Northern Illinois University |
| X | X | X | 1106 | Evanston, Northwestern University |
| | | | | **INDIANA** |
| X | X | X | 1210 | Bloomington, Indiana University–Bloomington |
| X | X | X | 1214 | Indianapolis, Indiana Purdue Univ–Indianapolis |
| X | X | X | 1252 | Notre Dame, Notre Dame Law School |
| X | X | X | 1256 | Valparaiso, Valparaiso University |
| | | | | **IOWA** |
| X | | X | 1272 | Ankeny, Des Moines Area CC–Ankeny |
| X | X | X | 1294 | Cedar Rapids, Coe College |
| X | X | X | 1356 | Iowa City, University of Iowa |
| | | | | **KANSAS** |
| X | X | X | 1470 | Lawrence, University of Kansas |
| X | X | X | 1474 | Topeka, Washburn University |
| | | | | **KENTUCKY** |
| X | X | X | 1535 | Florence, Gateway Comm Coll–Boone Campus |
| | X | X | 9947 | Lexington, Best Western Lexington |
| X | | X | 1531 | Lexington, Bluegrass Comm & Tech College |
| X | X | X | 1554 | Lexington, University of Kentucky |
| X | X | X | 1556 | Louisville, University of Louisville |
| | | | | **LOUISIANA** |
| X | X | X | 1590 | Baton Rouge, Louisiana State University |
| X | | X | 1611 | New Orleans, Southern University–New Orleans |
| X | X | X | 1591 | New Orleans, University of New Orleans |
| | | | | **MAINE** |
| X | X | X | 1644 | Portland, University of Southern Maine |
| | | | | **MARYLAND** |
| X | X | X | 1845 | Baltimore, Johns Hopkins University |
| X | X | X | 1746 | College Park, University of Maryland |
| X | | | 1723 | Rockville, Montgomery College |
| X | X | X | 9572 | Rockville, Univ of Maryland System |
| | | | | **MASSACHUSETTS** |
| X | | X | 1794 | Boston, Boston University School of Law |
| X | | X | 1787 | Boston, Wentworth Institute of Technology |
| X | X | X | 1900 | Bridgewater, Bridgewater State University |
| X | X | X | 1840 | Cambridge, Harvard University Law School |
| X | X | X | 1790 | Newton Center, Boston College Law School |
| X | | X | 1910 | Salem, Salem State College |
| X | X | X | 1930 | Springfield, Western New England College |
| | | | | **MICHIGAN** |
| X | X | X | 1977 | Ann Arbor, Concordia University |
| X | X | X | 2067 | Ann Arbor, Washtenaw Community College |
| X | X | X | 2060 | Detroit, University of Detroit-Mercy |
| X | X | X | 2033 | Rochester, Oakland University |
| X | | X | 2072 | Rochester, Rochester College |

38

| MAR | AUG | NOV | CODE | |
|-----|-----|-----|------|---|
| | | | | **MINNESOTA** |
| X | | X | 2147 | Minneapolis, Minneapolis Comm and Tech College |
| X | X | X | 2156 | Minneapolis, University of Minnesota |
| X | | X | 2102 | Saint Paul, University of St. Thomas |
| X | X | X | 2174 | Saint Paul, William Mitchell College of Law |
| | | | | **MISSISSIPPI** |
| X | X | X | 2240 | Holly Springs, Rust College |
| X | | X | 2245 | Jackson, Belhaven College |
| X | X | X | 2246 | Jackson, Mississippi College School of Law |
| | | | | **MISSOURI** |
| X | X | X | 2382 | Columbia, University of Missouri |
| X | X | X | 2380 | Kansas City, Univ of Missouri at Kansas City |
| X | | X | 2352 | Saint Louis, Saint Louis University |
| X | X | X | 2383 | Saint Louis, Univ of Missouri–Saint Louis |
| X | X | X | 2386 | Saint Louis, Washington University |
| | | | | **MONTANA** |
| X | X | X | 2422 | Missoula, University of Montana |
| | | | | **NEBRASKA** |
| X | X | X | 4787 | Lincoln, Southeast Community College |
| X | X | X | 2444 | Omaha, Creighton University School of Law |
| X | X | | 2464 | Omaha, University of Nebraska at Omaha |
| | | | | **NEVADA** |
| X | X | X | 2496 | Las Vegas, University of Nevada–Las Vegas |
| X | | X | 2498 | North Las Vegas, Community College of Southern Nevada |
| | | | | **NEW HAMPSHIRE** |
| X | X | X | 2518 | Plymouth, Plymouth State University |
| | | | | **NEW JERSEY** |
| X | | X | 2598 | Camden, Rutgers University |
| | X | | 2599 | Cherry Hill, Holiday Inn Cherry Hill |
| | | | | **NEW MEXICO** |
| X | X | X | 2650 | Albuquerque, University of New Mexico |
| X | X | X | 2657 | Los Lunas, University of New Mexico |
| | | | | **NEW YORK** |
| X | | X | 2679 | Albany, Albany Law School |
| X | X | X | 2714 | Albany, College of Saint Rose |
| X | X | X | 2926 | Albany, University at Albany |
| X | X | X | 9910 | Brooklyn, Brooklyn Law School |
| X | X | X | 2812 | Brooklyn, Medgar Evers College |
| X | | X | 2690 | Buffalo, Canisius College |
| X | X | X | 2978 | Buffalo, State Univ of New York at Buffalo |
| | X | | 2961 | Central Islip, Touro Law Center |
| X | | | 9565 | Ithaca, Clarion University Hotel |
| X | X | X | 2564 | New York, City Univ of New York–Hunter College |
| X | | X | 2840 | New York, Columbia University |
| X | X | X | 9810 | New York, Jacob Javits Convention Center |
| X | X | X | 9472 | New York, New York Law School |
| X | X | X | 2838 | New York, New York University |
| X | X | X | 2939 | Old Westbury, State Univ of New York–Old Westbury |
| X | X | X | 2861 | Syracuse, Bryant Stratton Business Inst |
| X | | X | 2790 | Syracuse, Le Moyne College |
| X | X | X | 2847 | Syracuse, Onondaga Community College |
| X | | X | 8021 | Syracuse, Sheraton Univ Hotel & Conference |
| X | X | X | 2740 | Williamsville, Erie Community College–North Campus |
| | | | | **NORTH CAROLINA** |
| X | | X | 3081 | Charlotte, Central Piedmont Comm Coll |
| X | | | 9579 | Charlotte, East Mecklenburg High School |
| X | X | X | 3132 | Durham, North Carolina Central University |
| X | X | X | 9646 | Morrisville, Goels Plaza |
| X | X | X | 3168 | Winston-Salem, Wake Forest University |
| | | | | **NORTH DAKOTA** |
| X | X | X | 3218 | Grand Forks, University of North Dakota |
| | | | | **OHIO** |
| X | X | X | 3310 | Ada, Ohio Northern University |
| X | | X | 3338 | Akron, Univ of Akron |
| X | X | X | 5571 | Cincinnati, Workforce Development Center |
| X | X | X | 3244 | Cleveland, Case Western Reserve University |

39

| MAR | AUG | NOV | CODE | |
|-----|-----|-----|------|---|
| X | X | X | 9519 | Cleveland, Cleveland State University |
| X | X | X | 3312 | Columbus, Ohio State University |
| X | X | X | 3295 | Dayton, Wright State University |
| X | X | X | 3344 | Toledo, University of Toledo |
| | | | | **OKLAHOMA** |
| X | | | 3390 | Edmond, University of Central Oklahoma |
| X | X | X | 3423 | Oklahoma City, Oklahoma St Univ–Oklahoma City |
| X | X | X | 3444 | Tulsa, University of Tulsa |
| | | | | **OREGON** |
| X | | X | 3490 | Eugene, Lane Community College |
| X | X | X | 3498 | Eugene, University of Oregon |
| X | X | X | 3500 | Portland, University of Portland |
| X | | X | 3493 | Salem, Chemeketa Community College |
| | | | | **PENNSYLVANIA** |
| X | X | X | 3555 | Harrisburg, Dixon University Center |
| X | X | X | 3590 | Harrisburg, Temple Univ–Harrisburg Campus |
| X | X | X | 3592 | Philadelphia, Holy Family University |
| X | | X | 3593 | Philadelphia, Lincoln Technical Institute |
| X | X | X | 9706 | Philadelphia, Sheraton University City Hotel |
| X | X | X | 3724 | Philadelphia, Temple University |
| X | X | X | 3560 | Pittsburgh, Duquesne University |
| X | X | X | 3734 | Pittsburgh, University of Pittsburgh |
| X | X | X | 3676 | Rosemont, Rosemont College |
| | | | | **RHODE ISLAND** |
| X | X | X | 9600 | Warwick, Community College of Rhode Island |
| | | | | **SOUTH CAROLINA** |
| X | X | X | 5009 | Charleston, Charleston School of Law |
| | X | | 3846 | Charleston, College of Charleston |
| | X | | 9902 | Columbia, Columbia Metropolitan Conv Ctr |
| X | | X | 3880 | Columbia, University of South Carolina |
| X | | X | 3851 | West Columbia, Midlands Technical College |
| | | | | **SOUTH DAKOTA** |
| | X | | 9294 | Pierre, Ramkota Hotel |
| X | X | X | 3928 | Vermillion, University of South Dakota |
| | | | | **TENNESSEE** |
| X | X | X | 4026 | Knoxville, Univ of Tennessee at Knoxville |
| X | | X | 3992 | Memphis, University of Memphis |
| X | X | X | 3994 | Murfreesboro, Middle Tennessee State University |
| | X | X | 3946 | Nashville, Belmont University |
| X | X | X | 4036 | Nashville, Vanderbilt University |
| | | | | **TEXAS** |
| X | X | X | 4104 | Austin, Huston-Tillotson University |
| X | X | X | 4240 | Austin, Thompson Conference Center |
| X | X | X | 4768 | Dallas, Bill J Priest Inst for Econ Dev |
| X | X | X | 9649 | Fort Worth, Norris Conference Center |
| X | X | X | 4264 | Houston, South Texas College of Law |
| X | | X | 4216 | Houston, Texas Southern University |
| X | X | X | 4236 | Houston, University of Houston Main Campus |
| X | X | X | 4220 | Lubbock, Texas Tech University |
| X | | X | 0004 | Plano, Collin College |
| X | X | X | 4140 | San Antonio, Our Lady of the Lake University |
| X | X | X | 4158 | San Antonio, Saint Mary's Univ of San Antonio |
| X | X | X | 4062 | Waco, Baylor University |
| | | | | **UTAH** |
| X | X | X | 4278 | Orem, Utah Valley University |
| X | | X | 4266 | Provo, Brigham Young University |
| X | X | X | 4274 | Salt Lake City, University of Utah |
| | | | | **VERMONT** |
| X | X | X | 4324 | South Royalton, Vermont Law School |
| | | | | **VIRGINIA** |
| X | | | 4412 | Charlottesville, University of Virginia |
| X | X | | 9809 | Falls Church, Marriott Fairview Park |
| X | | | 4560 | Hampton, Hampton University |
| X | X | X | 4430 | Lexington, Washington and Lee University |
| X | X | X | 4347 | Norfolk, Old Dominion University |
| X | X | X | 4346 | Petersburg, Richard Bland College–W & M |
| X | X | X | 4380 | Richmond, Virginia Commonwealth University |
| X | X | X | 4443 | Williamsburg, College of William and Mary |

40

| MAR | AUG | NOV | CODE | |
|-----|-----|-----|------|---|
| | | | | **WASHINGTON** |
| X | X | X | 4484 | Seattle, University of Washington |
| | | | | **WEST VIRGINIA** |
| X | X | X | 4540 | Morgantown, West Virginia University |
| | | | | **WISCONSIN** |
| X | X | X | 4558 | Madison, Univ of Wisconsin Law School |
| X | X | X | 0155 | Milwaukee, Marquette University Law School |
| | | | | **WYOMING** |
| X | X | X | 5006 | Laramie, University of Wyoming |
| | | | | **GUAM*** |
| X | | | 5001 | Mangilao, University of Guam |
| | | | | **NORTHERN MARIANA ISLANDS*** |
| X | | | 5003 | Saipan, Northern Marianas College |
| | | | | **PALAU*** |
| X | | | 5002 | Koror, Palau Community College |
| | | | | **VIRGIN ISLANDS** |
| X | X | X | 5004 | Saint Thomas, University of the Virgin Islands |

* Testing in these locations will take place on the Monday following the test dates in March
  and November and Saturday following the test date in August.

# Appendix B: Accommodations for Applicants with Disabilities

## Testing of Applicants with Disabilities

The National Conference of Bar Examiners provides reasonable testing accommodations for MPRE examinees who have qualified disabilities as defined in the Americans with Disabilities Act Amendment Act (ADAAA) and who provide appropriate documentation in a timely manner.

Applicants with diagnosed physical, mental, sensory, or learning disabilities may request accommodations such as a reader, someone to record answers, a separate testing room, stop-the-clock breaks, and/or extra testing time. Presentation of the material in Braille, large-print, or audio formats is also available. Applicants approved for large-print test materials may request 18-point or 24-point type.

All requests are reviewed and, when warranted, reasonable accommodations will be provided in light of the applicant's specific impairment. Applications with requests for accommodations are evaluated by qualified professionals and, when appropriate, may also be submitted to independent external review by specialists in the area of the disability.

In determining whether an individual has a disability for which accommodations may be appropriate, the applicable standard under the ADAAA is whether the individual has an impairment that substantially limits him or her in a major life activity.

If you are requesting accommodations due to a disability, you must provide all the supporting documentation with a copy of the online confirmation received after submission of an online application or with a completed paper application. All supporting documentation must be submitted each time you apply for the MPRE, and must be received by the late application receipt deadline.

Requests that are not supported by appropriate and timely documentation, demonstrating the need for the requested accommodations, will be denied. If you are denied accommodations, your registration materials will be processed as a standard registration and you will be assigned to a test center.

42

**Disability Documentation**

1. You must provide **your own written request for accommodations**, preferably in the form of a letter. Include a detailed description of your diagnosed condition and indicate specifically the testing accommodations you believe are necessary for you to take the MPRE based on your disability. Include a telephone number where you can be reached during the day. You are encouraged to also provide a fax number and/or e-mail address. If you are requesting additional testing time, your letter must specify a precise amount of additional time (e.g., time-and-a-half). A request for an untimed examination, or simply for extra time, is not sufficient.

2. Include **current documentation by your clinician, physician, or other professional** with training and experience appropriate to diagnose and treat your disability. An individual is deemed to be qualified to conduct a medical or health-related evaluation if s/he has had comprehensive training and experience in the relevant medical specialty and has appropriate licensure/certification. Therefore, it is not appropriate for students or trainees to conduct the evaluation even if the final written report is signed by a qualified professional. Your professional should include a brief statement of his or her qualifications and areas of specialty.

   The documentation must provide detailed results from a complete, appropriate diagnostic examination and an assessment of the functionality-limiting manifestations of the condition(s) for which accommodations are needed. It must set forth in detail the diagnosis, the treatment provided, and the last date of treatment and/or consultation with the qualified professional. It must also provide an explanation of the need for the requested accommodation(s) and how the functional limitation of the disability relates to this test-taking activity. A description of the accommodations deemed appropriate should also be included. If you are requesting additional testing time, the documentation prepared by your professional must state the precise amount of additional time that is deemed necessary, as well as the rationale for the additional testing time requested.

   The provision of reasonable accommodations is based on assessment of the *current* impact of your disability *on the testing activity*. As a general rule, documentation should be from an evaluation conducted within the preceding five years. Older documentation may suffice

43

for conditions that are permanent and nonvarying if it is accompanied by a letter from a qualified professional that provides an update on the diagnosis, your current level of functioning, changes since the previous evaluation, current treatment, and continued rationale for the requested accommodations. Reports of previous diagnostic assessments can be helpful in establishing history and precedent, but are not acceptable in establishing current impact on taking the MPRE under standard conditions. More recent documentation may be necessary for some conditions. Please refer to the guidelines below for more information regarding documentation currency for specific disabilities.

3. Enclose **documentation regarding accommodations that have been made in the past**, particularly on the multiple-choice sections of the ACT, SAT, and LSAT, in law school, and on any bar examinations. Note that accommodations granted elsewhere do not necessarily entitle you to accommodations on the MPRE, although considerable weight is given to past accommodations received in similar testing situations or in response to an IEP or Section 504 plan.

4. If you request accommodations of extended time and/or a separate testing room because of a disability affecting **cognitive functioning (e.g., LD)**, your documentation must include *all* of the following:

   • A description of the presenting problem(s) and the related developmental history.

   • A neuropsychological or psychoeducational evaluation with reports of aptitude assessments using a complete comprehensive battery. Acceptable measures include but are not limited to the Wechsler Adult Intelligence Scale-IV (WAIS-IV), the Woodcock-Johnson III NU: Tests of Cognitive Abilities, and the Kaufmann Adolescent and Adult Intelligence Test.

   • A complete and comprehensive achievement battery including current levels of academic functioning in relevant areas such as reading (phonetic decoding, reading rate, and comprehension) and written language (e.g., Wechsler Individual Achievement Test (WIAT III), Woodcock-Johnson III NU: Tests of Achievement, or the Scholastic Abilities Test for Adults). Screening tests such as the Wide Range Achievement Test-3 and the Nelson-Denny Reading Test sometimes provide useful supplementary information but cannot, in themselves, determine reading ability.

44

- For assessments containing subtests (i.e., WIAT III or Woodcock-Johnson III NU), the scores from all subtests must also be included. All standard scores should be provided on age-adjusted rather than education-adjusted norms.

- An assessment of information processing (e.g., short- and long-term memory, sequential memory, processing speed, and executive functioning) using appropriate instruments (e.g., Wechsler Memory Scale III, Delis-Kaplan Executive Function System, or relevant subtests from the Woodcock-Johnson III NU: Tests of Cognitive Abilities).

- Other appropriate assessment measures to help support a differential diagnosis or to disentangle the cognitive disability from co-existing neurological and/or personality disorders.

**Please note:** All tests must be reliable, valid, and standardized for use with an adult population. All standard scores must be provided in standard score and percentile formats. All standard scores should be provided on age-adjusted rather than education-adjusted norms. Your professional must provide a specific diagnosis with an interpretation of tests being provided and show evidence that alternative explanations (e.g., poor motivation or study skills, or cultural or language differences) can be ruled out.

An inability to complete the test under standard time conditions is not a reason for testing accommodations. Not all standard test takers are able to complete the MPRE under standard time conditions.

5. If you request accommodations because of **Attention Deficit/Hyperactivity Disorder (ADHD)**, the professional's report must include a review of the history of each of the DSM-IV diagnostic criteria for ADHD and specify which symptoms that cause impairment were present in childhood and which current symptoms have been present for at least the past six months. Relevant batteries described above in section 4 cannot be used as the sole basis of ADHD diagnosis, independent of history and interview. Such batteries, however, often augment the ADHD evaluation and should be reported. They are particularly necessary to rule out intellectual limitation as an alternative explanation for academic difficulty, to describe type and severity of learning problems, and to assess the severity of cognitive deficits associated with ADHD (inattention, working memory, etc.).

45

Although self-reporting of symptoms and events is help-ful, it is critical that information from other sources (e.g., health care professionals, relatives, teachers, school records, or employers) be presented to your professional and sum-marized in the report.

A well-written diagnostic summary, based on a compre-hensive evaluative process, is a necessary component of the assessment. The clinical summary must include:

- a demonstration of the professional(s) having ruled out alternative explanations for the inattentiveness, impulsivity, and/or hyperactivity;

- an indication of the patterns of symptoms across your life span and settings used to determine the presence of ADHD;

- an indication of the substantial limitation to a major life activity (such as learning) presented by ADHD and the degree to which it impacts you in the context for which accommodations are being requested; and

- an explanation of why specific accommodations are needed and how the effects of ADHD symptoms, as designated by the DSM-IV, are mediated by the accommodations.

6. If you request accommodations because of a **mood or anxiety disorder**, documentation should include a review of the family history, age of onset and course of illness, psychological tests used, the history of treat-ment for the disorder, a detailed description of psychi-atric symptoms to support the diagnosis, and a description of symptom frequency and intensity to establish the severity of the disorder. If treatment includes medication, please provide evidence of con-tinued impairment despite benefits of medication. In addition, please provide information as to the substan-tial limitation experienced as a result of this diagnosis, and how it is relevant to standardized testing. Due to the variable nature of these conditions, documentation of a mood or anxiety disorder should be current within the past year.

7. If you request extended time because of a **visual dis-ability**, a report of a complete ocular examination rel-evant to the condition is required. It must include the current diagnosis (including a statement as to whether the condition is progressive or stable), best corrected visual acuities for distance and near vision, all test results, a description of functional limitation, a discus-sion of the extent to which the limitation has been or

46

can be addressed through corrective devices, and a specific recommendation and rationale for accommodations. If the diagnosed condition is purported to affect reading speed, results of a measure of reading (decoding, rate and comprehension) are required. Documentation of visual disabilities generally should be current within one year. If you are legally blind, documentation acknowledging this specifically (e.g., from a governmental agency or your eye doctor) can substitute for a complete ocular exam.

8. If you request accommodations because of a **chronic medical or physical condition**, the diagnostic report typically should be less than 12 months old. Because of the changing nature of some physical or medical disabilities, it is critical that documentation be current. Documentation that is 12 to 24 months old may be acceptable if it is accompanied by a letter from a qualified professional that provides an update on the diagnosis, your current level of functioning, changes since the previous evaluation, current treatment, and continued rationale for the requested accommodations. Reports of diagnostic assessment that are older than 24 months will be helpful in establishing history and precedent, but will not be acceptable in establishing current impact.

Documentation should include all of the following:

- A clear statement of the medical diagnosis from a physician, neurologist, or other medical specialist.

- An assessment of the functionality-limiting manifestations of the condition(s) for which accommodations are needed.

- A description of present symptoms which meet the criteria for diagnosis.

- A list of medications or treatments currently being used to relieve the functional manifestations of the condition.

- Medical information relating to your impairment, including the impact of medication or other treatments on your ability to meet the demands of a multiple-choice format examination.

- Recommendations of reasonable accommodations as applied to the MPRE (a multiple-choice format examination) are required. These recommendations should be supported by the diagnosis and by a rationale explaining how these specific accommodations address your functional limitations.

47

Apply as far as possible in advance of the deadline. During peak time it may take three to four weeks to process the application and receive a reply. If you apply sufficiently early, NCBE may be able to communicate with you regarding omissions in your documentation in time for you to send supplemental material by the deadline. **Additional information will not be accepted after the late application receipt deadline.**

**Send all materials together.** Do not ask your physician or other qualified professional, or any other individual or agency providing documentation, to send materials directly to NCBE. Due to the number of applications received, it is not possible to guarantee that materials can be matched and that an applicant's materials will be complete.

It is your responsibility to notify NCBE of your need for accommodations **at the time you apply for the examination**.

Requests for accommodations that are received after the deadline for late application will not be considered.

Requests that are not supported by appropriate documentation submitted by the late application receipt deadline will be denied. You may seek clarification on policies regarding accommodations or inquire about the status of a pending request by writing to:

MPRE Accommodations
101 ACT Drive
P.O. Box 4001
Iowa City, IA 52243-4001
Fax: (319) 337-1122
**mpre.ada@act.org**

During peak processing times (near application deadlines) it is generally preferable to communicate via fax or e-mail. All accommodation decisions are based on the written record. Requests for reconsideration/appeal must be in writing and should include information not previously submitted.

NCBE is not responsible for administering or determining the criteria for state bar examinations, which are separate and distinct examinations from the MPRE. Policies for determining testing accommodations available to applicants with disabilities in admitting jurisdictions may vary from the policies used to provide accommodations for the MPRE. Any accommodations provided by NCBE are for administration of the MPRE only and are in no way binding on individual admitting jurisdictions. NCBE urges all applicants taking a state bar examination who may require accommodations because of a disability to ascertain the procedure for requesting such accommodations for each state where they propose to sit for the bar examination.

**National Conference of Bar Examiners**

*Officers for 2010–2011*

Chair
Philip M. Madden, CA

President
Erica Moeser, WI

Immediate Past Chair
Sam Hanson, MN

Chair-Elect
Rebecca S. Thiem, ND

Secretary
Franklin R. Harrison, FL


Board of Trustees
Hon. Rebecca White Berch, AZ
Hon. Thomas J. Bice, IA
Mark S. Carlin, DC
Robert A. Chong, HI
Margaret Fuller Corneille, MN
Michele A. Gavagni, FL
Darryl W. Simpkins, NJ
Bryan R. Williams, NY


National Conference of Bar Examiners
302 S. Bedford Street
Madison, WI 53703-3622
(608) 280-8550
Fax: (608) 280-8552
TDD: (608) 661-1275
www.ncbex.org

15223                 • 0 4 5 0 8 1 1 1 A •   Rev 1