UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2011 AUG -2  AM 11: 26

CLERK

BY _____
DEPUTY CLERK

DEANNA L. JONES,                  )
                                  )
        Plaintiff,                )
                                  )
v.                                )     Case No. 5:11-cv-174
                                  )
NATIONAL CONFERENCE OF            )
BAR EXAMINERS,                    )
                                  )
        Defendant.                )

## ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
### (Doc. 2)

This matter came before the court on July 22 and August 1, 2011 for an evidentiary hearing on Plaintiff Deanna L. Jones's Motion for a Preliminary Injunction (Doc. 2).  Plaintiff alleges Defendant National Conference of Bar Examiners is violating the Americans With Disabilities Act, 42 U.S.C. §§ 12181, *et seq.* ("ADA") by refusing to allow Plaintiff to access the Multistate Professional Responsibility Exam ("MPRE") using a computer equipped with screen access software.  Plaintiff seeks an injunction requiring Defendant to provide this and other accommodations.  Defendant opposes Plaintiff's motion, arguing that Plaintiff failed to engage in an interactive process to reach agreement on the appropriate accommodations for the MPRE and created her own emergency by untimely notifying Defendant of her requested accommodations.  Defendant further contends that Plaintiff cannot satisfy the requirements for a preliminary injunction and asserts the accommodations Defendant has offered Plaintiff for the MPRE are "reasonable accommodations" as a matter of law.

For the reasons set forth below, the court hereby GRANTS Plaintiff's request for injunctive relief.

## I.  Factual Findings.

Based upon the preponderance of the evidence, the court makes the following findings of facts:

1. Plaintiff is an approximately forty-four year old student in her third year of a four year program at Vermont Law School ("VLS") who has applied to take the August 5, 2011 MPRE exam.

2. Defendant is a non-profit organization with sixty-four full-time equivalent employees based in Madison, Wisconsin.  Defendant developed and owns the MPRE and determines the format in which the MPRE is offered.  Defendant has contracted with ACT, Inc. ("ACT") to administer the MPRE in Vermont.  A passing score on the MPRE is a condition precedent to a lawyer's admission to practice law in the Vermont.  Defendant has developed and owns three other standardized examinations: the Multistate Bar Examination ("MBE"), the Multistate Essay Examination ("MEE"), and the Multistate Performance Test ("MPT").

3. The MPRE is a sixty-question standardized test which tests an applicant's knowledge of the law governing the conduct of lawyers, including the disciplinary rules of professional conduct currently articulated in the American Bar Association ("ABA") Model Rules of Professional Conduct, the ABA Model Code of Judicial Conduct, and controlling constitutional decisions and generally accepted principles established in leading federal and state cases and in procedural and evidentiary rules.  The test is designed to last approximately two hours and is typically administered as a "paper-and-pencil" examination.  It is considered a "secure" test in that the questions used may be re-used in future years so that scores may be "equalized" over multiple test years.  The test is offered in August, November, and March, with November being the most popular month and August the least.  The vast majority of law students take the MPRE in their third year of law school.  The MPRE is a pass/fail exam although it is graded numerically.  In Vermont, a score of 80 is a passing score.

4. Defendant estimated that each MPRE exam costs Defendant approximately $150,000 to $200,000, although it did not explain how this estimate was derived.  Defendant considers the MPRE a "high stakes" examination which requires a high level of reliability and integrity.  An applicant must timely register for and pay a fee of $63 to take the exam.  An applicant may take the MPRE on multiple occasions.

5. The MBE, like the MPRE, is a "secure" test.  The MPT and MEE are not and Defendant routinely offers these tests in an electronic format and also allows them

to be taken with magnification software such as ZoomText and screen reader software such as the Kurzweil 3000. Defendant does not generally offer these options with regard to the MBE and MPRE because of its security concerns. Instead, Defendant's protocols require it to furnish its secure tests in a locked case which contains a laptop which Defendant has loaded with the test and the specialized software. Through a pilot program in 2008 and 2009, Defendant has had the opportunity to experiment with screen access software for visually impaired persons and thus Defendant is not unfamiliar with the accommodations Plaintiff has requested.

6. One security concern identified by Defendant is that a visually impaired test taker under the surveillance of a one-on-one proctor could place a "thumb drive" in the laptop and copy the test. Defendant, however, is able to disable the thumb drive access on the laptop it provides to test takers and this security concern has never come to fruition. Defendant has had several temporary security breaches with paper and pencil administrations of the MPRE. It has never had a known security breach with the computer-based format of the MPRE exam which it has offered on several occasions.

7. Plaintiff has been legally blind since age five. She has atypical retinitis pigmentosa with macular degeneration in each eye which deprives her of centralized vision and prevents her from seeing anything other than objects in the periphery of her vision. She has a very small island of vision that she can access from the periphery by adjusting the angle at which she views an object. Her limited peripheral vision is deteriorating. Indeed, Plaintiff's overall vision has progressively worsened during her lifetime. Her distance visual acuity on April 20, 2011 measured 8/400 (20/1000) in the right eye and 8/500 (20/1250) in the left eye. For reading fluently, Plaintiff requires slightly more than 20 times (20x) magnification to be able to function at near range with standard print. Plaintiff carries a hand magnifier with fourteen times (14x) magnification with her at all times.

8. Plaintiff describes her early education as a "rough ride" with her mother attempting to reteach Plaintiff everything after school that Plaintiff was supposed to learn in the course of a school day. Plaintiff credibly testified: "I got through school and I worked really hard with mother every day. I would come home most days and be a wreck. I was overwhelmed. Mother helped sort it out." Plaintiff did not achieve any significant measure of academic success during this early time period.

9. Upon graduation from high school, Plaintiff attended college for approximately one year. During this time period, Plaintiff had access to large print and human readers. She failed numerous classes and had a G.P.A. of .92. Plaintiff dropped out of college and decided to pursue a career in food service and other enterprises

in which she demonstrated both competence and leadership skills. During this time period, Plaintiff worked with her optometrist, Stephen Feltus, and an assistive technology expert for the visually impaired, Geoffrey Howard, in an effort to accommodate her visual impairments. In addition to a hand held magnifier and the use of human readers, Plaintiff used a closed circuit television ("CCTV") which magnifies text.

10. Plaintiff eventually became aware that she had other challenges beyond her blindness and that she was unable to retain information like other people including her older brother who is also legally blind. When a family member was diagnosed with a learning disability, Plaintiff began to investigate whether a learning disability might also be contributing to her own educational challenges.

11. In 2000, Plaintiff was evaluated by Shirley Bate, M.Ed., C.A.S. and Lorraine Clodfelter, M.S., who administered to Plaintiff a battery of tests to determine whether Plaintiff had a learning disability. Although Plaintiff was not initially diagnosed with a learning disability, several learning deficiencies were identified. A subsequent evaluation by Ms. Bate in August of 2003 concluded that Plaintiff suffered from a reading disability due to deficits in phonological memory and phonological awareness.

12. As part of her investigation of whether she had a learning disability, Plaintiff consulted with Geoffrey Howard who recommended that Plaintiff use ZoomText, which is a computerized magnification program, and Kurzweil 1000, which is a text-to-speech software program that highlights in different colors words and sentences on a computer screen, as well as an audio reading of the text that tracks the highlighting. Plaintiff began working with both programs and immediately demonstrated an ability to access written text in a manner that had previously eluded her.

13. Plaintiff used the ZoomText and Kurzweil software and "for the first time felt [she] could really access the information." She enrolled in college "and for the first time in [her] life she could read anything [she] want[ed]" and "didn't feel stupid." Prior to the use of this technology, the only book Plaintiff had ever read completely was The Diary of Anne Frank which she used for every book report she was assigned. Plaintiff achieved her first sustained educational success in college and began to consider pursuing a law degree which had been a childhood dream.

14. The Law School Admission Test ("LSAT") is a multiple choice and essay examination which takes a half-day to complete under standard conditions. In 2007, Plaintiff requested accommodations for the LSAT pertaining solely to her visual impairment. She requested triple time for the examination, but was granted only double time which she did not fully use. Plaintiff was allowed to use a computer for the essay portion of that exam. She had a reader for the multiple

choice section of the exam. Plaintiff found the LSAT experience frustrating and does not feel she performed to the full extent of her abilities. She recalls the experience as a very long day in which she was "just trying to survive." She received a score of 148 which is in the 37th percentile.

15. VLS is the only law school to which Plaintiff applied. Throughout law school, in addition to other accommodations, Plaintiff has used and continues to use a Windows XP laptop computer equipped with ZoomText 9.12 and Kurzweil 3000 v. 11.05 for all of her lengthy reading assignments and to read all examination materials. The screen-access software enables Plaintiff to listen to a vocalization of the electronic text, visually track highlighted lines and words as they are vocalized, magnify the displayed text, and navigate within the text in a manner that is similar to the access provided by sighted reading. In addition to highlighting text, the software allows the user to obtain precise voice adjustments and increase and decrease reading speed.

16. Plaintiff uses screen-access software as her primary reading method and is very proficient in its use. It is the most effective method by which she may access lengthy written text. Plaintiff has been able to perform well in law school with its assistance, although she still faces challenges not encountered by her sighted peers. Even with screen-access software, Plaintiff requires additional time to navigate through text and complete a written examination. She also requires the ability to take notes so that she can repeat information she has heard and more readily recall it.

17. The ZoomText software program was first released in 1998 and is currently the most popular large print software program nationwide for the visually impaired. The Kurzweil 1000 software program was first released in 1978 and was initially marketed only to the visually impaired. The Kurzweil 3000 program is currently marketed to both the visually impaired and to individuals with dyslexia.

18. As part of Plaintiff's request for accommodations with regard to the MPRE, the Stern Center, which is a professional entity that, among other things, provides diagnostic testing, assessments, and evaluations for learning disabilities, performed a comprehensive analysis of Plaintiff's reading and writing abilities to determine whether she might have dyslexia or some other learning disorder. The Stern Center found that Plaintiff's cognitive abilities fell solidly in the average range with some below average and above average variations. The Stern Center concluded that Plaintiff has a learning disorder that consists of information processing weaknesses specific to visual processing speed and auditory attention and memory systems, as well as weaknesses in phonological decoding/encoding, grammar, and some aspects of high level verbal reasoning. Plaintiff's auditory memory deficiency impairs her ability to retain auditory information for a sufficient time period to effectively process it. Notwithstanding her blindness,

Plaintiff is a visual learner who most effectively processes information by seeing it in a magnified version and having words and sentences highlighted through the use of color and spoken aloud by a synchronized voice. In combination, the Stern Center found the characteristics of Plaintiff's learning disorder significantly compromise her listening and reading comprehension, as well as the rate at which she reads and writes. Defendant does not challenge the accuracy of this diagnosis.

19. The court finds that the Stern Center has properly diagnosed and explained the nature and extent of Plaintiff's learning disorder and has identified accommodations that are both preferred and necessary for Plaintiff including the use of a computer with ZoomText Magnifier/Reader and Kurzweil 3000 screen reader so that Plaintiff may read and listen to written information simultaneously. The Stern Center evaluation also provides support for Plaintiff's other requested accommodations.

20. The MPRE 2011 Information Booklet states that all requests for accommodations are reviewed by qualified professionals.[1] The booklet lists the materials that must accompany each request for accommodations including the applicant's own written request for accommodations, and current documentation by the applicant's clinician, physician, or other professional with training and experience appropriate to diagnose and treat the applicant's disability. The documentation must include a brief statement of the professional's qualifications, detailed results from a complete, appropriate diagnostic examination, and an assessment of the functionality-limiting manifestations of the conditions for which accommodations are needed. The documentation must contain a detailed diagnosis, the treatment provided, and the last date of treatment or consultation. The professional must provide an explanation of the need for the requested accommodation and how the functional limitation of the disability relates to test-taking. All such documentation must reflect the current state of the applicant's disability. The applicant must also enclose documentation regarding accommodations that have been made in the past, especially with regard to other standardized exams.

21. For a cognitive disability such as a learning disability, the MPRE applicant must also submit a neuropsychological or psychoeducational evaluation with reports of aptitude assessments using a comprehensive battery, a complete and comprehensive achievement battery including current level of academic functioning in relevant areas, scores from all subtests, an assessment of information processing using appropriate instruments, and other appropriate assessment measures. All tests must be reliable, valid, and standardized for use

---

[1] Defendant argues that it did not have time to obtain expert witnesses for the court's preliminary injunction hearing but did not call any of the qualified professionals who reviewed Plaintiff's Accommodations Request.

with an adult population and must be provided in standard score and percentile formats.

22. The visually impaired MPRE applicant who seeks accommodations based upon that disability must submit a report of a complete ocular examination relevant to the condition for which accommodations are sought. The examination report must include the current diagnosis (including whether the condition is progressive or stable), best corrected visual acuities for distances and near vision, all test results, a description of each functional limitation, a discussion of the extent to which the limitation has been or can be addressed through corrective devices, and a specific recommendation and rationale for accommodations. If a diagnosed condition is purported to affect reading speed, further test results are required. Documentation of visual disabilities is generally required to be current within one year.

23. Plaintiff first notified Defendant of her requested accommodations by letter dated June 16, 2011 (the "Accommodations Request"), the same day she received Stephen Feltus's report. Plaintiff's five-page Accommodations Request included reports from Stephen Feltus, Geoffrey Howard, the Stern Center and Plaintiff's retinal specialist, Eliot L. Berson, M.D. of Harvard Medical School and the Massachusetts Eye & Ear Infirmary. There is no evidence that Plaintiff's submission was incomplete in any respect.

24. Plaintiff's Accommodations Request was filed in advance of the July 5, 2011 deadline for such requests. Had Plaintiff submitted her Accommodations Request in a piecemeal fashion, it would not have been addressed until her submission was complete. While Plaintiff could have submitted her Accommodations Request as early as November 2010,[2] and was contemplating taking the August 5, 2011 exam as early as January of this year, she did not have the required documentation to pursue an accommodations request in January of 2011. In the spring of 2011, she acted diligently and in good faith to obtain the extensive materials necessary for her Accommodations Request. She then submitted those materials as soon as practicable after their receipt. Any delay was attributable to the difficulty of scheduling appointments around Plaintiff's law school and exam schedule, and in the preparation of the reports by the experts for submission.

25. Plaintiff's Accommodations Request sought the following accommodations: (a) the use of a Windows XP laptop computer equipped with ZoomText 9.12 and Kurzweil 3000 v. 11.05 to read all examination materials; (b) an opportunity to test the laptop with sample MPRE questions in electronic format; © the use of identified peripheral devices with the laptop during the test; (d) a talking clock; (e) triple time for the examination with two 15-minute breaks; (f) a separate testing room; (g) a scribe to fill out administrative forms and answer sheets; (h) sundries,

---

[2] Defendant has not established that its forty-eight page MPRE 2011 Information Booklet was available at that time.

including a black marker, scrap paper, and a magnifying glass; and (I) water and a snack for the six-hour-plus test.

26. By letter dated June 17, 2011 which was sent via e-mail and regular mail, Plaintiff's attorney contacted Defendant's attorney and asked Defendant to undertake an individualized inquiry with regard to Plaintiff's requested accommodations. Counsel noted that if Plaintiff's requests could not be accommodated, litigation would be required and thus counsel requested Defendant's response by the close of business on June 30, 2011. Defendant's counsel had been aware of Plaintiff's likely request for accommodations on the MPRE in early June. Defendant's counsel did not formally respond to the June 17th letter and to this date Defendant has not made a final decision with regard to Plaintiff's requested accommodations. At no time has Defendant requested that Plaintiff submit to an independent evaluation of her disabilities and the appropriate accommodations for them. Defendant does not claim that additional time may alter its position with regard to Plaintiff's requested accommodations. Instead, it has stated that it will consider them further.

27. On June 29, 2011, Defendant, through the test administrator ACT, granted Plaintiff's request for the following accommodations: triple the time for the examination with two fifteen minute breaks; a separate testing room; a scribe to fill out administrative forms and answer sheets; and water and snack. Defendant further offered Plaintiff the following accommodations: the MPRE exam in Braille, as an audio CD, in enlarged print, the use of a CCTV, and the provision of a human reader. Defendant advised Plaintiff that the other accommodations she requested were not generally available on the MPRE, but that Defendant would like to work with Plaintiff to determine acceptable alternatives. Plaintiff responded that same day, noting that Defendant had been unspecific regarding the available alternative accommodations and asking what would be offered. Plaintiff asked that Defendant respond by the close of business. Defendant did not do so.

28. By e-mail dated July 13, 2011, Defendant offered Plaintiff the following additional accommodations: a marker, a talking clock, and scratch paper on which she could take notes. Defendant again offered to discuss Plaintiff's requested accommodations, but did not provide any indication that they would be granted now or in the future. Although Defendant generally offers the MPRE with either 18 point or 24 point font to accommodate requests for large print, Defendant is now willing to provide the MPRE to Plaintiff in 72 point font.[3] Defendant has identified no additional accommodations that it would be willing to offer Plaintiff.

29. Plaintiff is insufficiently proficient in Braille (which she first learned in 2007) to use it for a standardized test. She has never done so previously and does not use

---

[3] This font produces a poster-size examination booklet which still cannot fit a single question on a single page.

8

Braille as a routine method of reading. Were Plaintiff to take the MPRE in Braille, it would test her ability to decode Braille as opposed to her knowledge of a lawyer's professional responsibility obligations.

30. Plaintiff has used a CCTV for many years to access discrete pieces of written text such as recipes, invoices, and mail. She does not use a CCTV for lengthy reading. In law school, Plaintiff has used a CCTV in order to access Black's Law Dictionary. Although a CCTV provides Plaintiff with the desired magnification, it cannot display more than a small section of text and requires considerable motion in order to navigate through the text. If Plaintiff uses a CCTV over an extended period of time, she experiences eye fatigue and something akin to motion sickness. Because the visual field offered by a CCTV at the magnification required by plaintiff is so limited, a CCTV system is not an efficient or effective means for Plaintiff to scan, search, and read a document that is more than a couple of paragraphs. It also provides inadequate cues as to format, orientation, key words, and punctuation that Plaintiff needs to accommodate her learning disability.

31. Plaintiff has never been able to perform well on exams with a human reader as she has no context and does not have any way of determining where she is in the question and what she will need to do when the question is finished. Plaintiff needs to see the format of the question and be able to navigate through it herself, going back to phrases that she needs to re-read, in order to fully understand the text. Plaintiff has used digital audio and has found it cumbersome. She cannot read the tracks displayed on the equipment and finds that to re-access portions of the question is time consuming and confusing. Similarly, when Plaintiff uses a human reader, she loses the ability to freely and automatically navigate through text, because she has no visual reference which, in turn, impairs her ability to put what she is hearing into context, and decreases her ability to read and comprehend the material. Plaintiff's reliance on the visual presentation of text in order to discern context cannot be achieved through the use of a digital CD or a human reader. Even when used in conjunction with a magnified visual text, without highlighting, Plaintiff easily loses her place in the text and cannot navigate through it with either automaticity or fluidity.

32. Plaintiff filed her complaint and motion for preliminary injunction on July 1, 2011. Although Defendant has complained that the court scheduled the preliminary injunction motion hearing too quickly, Defendant had time to file a lengthy written opposition as well as a comprehensive twenty-six page motion for summary judgment with numerous exhibits and an accompanying 38-paragraph Statement of Undisputed Facts. Defendant has also filed a response to the U.S. Department of Justice's Statement of Interest. The court finds that Defendant has had an adequate opportunity to prepare for and respond to the preliminary injunction motion.

33. Defendant has already adjusted at least one of the accommodations it offers the visually impaired. It has decided to no longer use a human voice on its audio CD finding a synthetic voice preferable. It has also accelerated the speed of the CD based upon feedback from visually impaired test takers. As noted, Defendant has offered screen access software to other takers of the MPRE and routinely offers computerized format exams on its non-secure tests. There is no question that Defendant is able to offer the accommodations that Plaintiff has requested.

34. Plaintiff's requested accommodations are supported by detailed expert opinions authored by individuals qualified to opine that such accommodations are necessary for Plaintiff to perform on a written examination commensurate with her abilities. With the exception of the Stern Center, Plaintiff's expert witnesses are her treating professionals. Plaintiff has expressed a legitimate concern that without her requested accommodations, the MPRE will primarily test her ability to work through her disabilities and that she will not be able to compete on an equal basis with non-disabled test takers. Plaintiff's expert witnesses support this conclusion. Moreover, Plaintiff's experts have credibly collectively explained in detail why any other accommodation or combination of accommodations offered by Defendant would be inadequate.

35. Defendant proffered no evidence that any of the accommodations that it has offered to Plaintiff alone, or in combination, will allow Plaintiff to access the MPRE exam on an equal footing with her non-disabled peers. Indeed, Defendant has apparently undertaken no individualized analysis with regard to the accommodations that are reasonable for Plaintiff's disabilities, or that would best ensure that Plaintiff's aptitude rather than her ability to cope with her disabilities are measured by the MPRE.

36. Plaintiff seeks to take the MPRE exam on August 5, 2011 because she has paid for it, and set aside time this summer to study for it. She has also purchased sample questions and study guides. The November and March exam dates conflict with Plaintiff's law school schedule which requires her full concentration and time commitment. In order to properly prepare for the test during November and March, Plaintiff would have to readjust her class work load to allow sufficient time for studying and other preparation. This, in turn, may delay her graduation from law school and may impair her law school performance.

37. Plaintiff seeks to avoid having to take the MPRE in August of 2012, approximately one month after she takes the Vermont Bar Exam as she will be unable to adequately prepare for both exams at the same time. In addition, if Plaintiff fails the MPRE exam in July of 2011, she will not be able to take it again until November, almost six months after her expected graduation from law school.

38. Plaintiff's requested software may be loaded onto a lap top by a qualified person using a relatively simple process in approximately two hours and twenty minutes.

Significantly less time is required if the Microsoft updates have already been performed. In that event, the programs may be loaded in approximately thirty minutes. Plaintiff's expert, Geoffrey Howard, estimates that the cost to Defendant to make Plaintiff's requested computer software accommodations is approximately $3,500.

39. Defendant estimates the cost it will incur to accommodate Plaintiff's computer software requests is approximately $5,000. Defendant further estimates the cost to accommodate similar requests on the same basis is approximately $300,000 per year although Defendant concedes that this estimate is simply based upon the multiplication of the estimated $5,000 by an anticipated sixty annual requests. According to Defendant's president, in addition to the expense, accommodation of Plaintiff's requests would be "a significant time demand and a distraction from what [Defendant's] staff would ordinarily be doing."

40. On the Form 990 which Defendant filed with the I.R.S. as an organization exempt from income tax, Defendant reported "program service revenue" in excess of $12 million dollars in 2008 and in excess of $13 million dollars in 2009. Defendant's "net assets or fund balances" were reported to be in excess of $45 million in 2008 and in excess of $50 million in 2009. Defendant has not filed a Form 990 for 2010.

41. Plaintiff is willing to post a bond or other security in an appropriate amount to compensate Defendant in the event Defendant is found to have been wrongfully enjoined.

42. On August 1, 2011, Defendant advised the court that it needed a decision by noon on August 2, 2011 in order to comply with any court order requiring it to offer Plaintiff's requested accommodations for the August 5, 2011 MPRE.

## II. Conclusions of Law and Analysis.

### A. Standard of Review.

In *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), the Supreme Court articulated the standard for the issuance of a preliminary injunction:

A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.

*Id.* at 20 (citations omitted). The Second Circuit has described the standard as requiring a party seeking a preliminary injunction to show "(a) irreparable harm and (b) either (1)

likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy, Inc. v H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979). Recently, the Second Circuit ruled that the "serious questions" standard is still viable after *Winter*. *See Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 38 (2d Cir. 2010).

Where, as here, a party seeks an injunction that is mandatory in nature in that it will alter rather than maintain the status quo, he or she must satisfy a more rigorous standard and demonstrate a "clear or substantial likelihood of success on the merits." *Doninger v. Niehoff*, 527 F.3d 41, 47 (2d Cir. 2008); *Rossini v. Republic of Argentina*, 2011 WL 2600404, at *2 (2d Cir. July 1, 2011) (citing *Citigroup Global Mkts.*, 598 F.3d at 35 n. 4).

## B. The Requirements of the ADA.

Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). In doing so, Congress recognized that "discrimination against individuals with disabilities persists in such critical areas as employment . . . education . . . [and] communication" and that "the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous, and costs the United States billions of dollars in unnecessary expenses resulting from dependency and nonproductivity." 42 U.S.C. §§ 12101(a)(3), (a)(8).

The ADA requires Defendant, as an entity that offers a professional licensing examination, to "offer such examinations . . . in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals." 42 U.S.C. § 12189. The regulations that implement this mandate provide that Defendant:

> must ensure that the examination is selected and administered so as to *best ensure* that, when the examination is administered to an individual with a disability . . . the examination results accurately reflect the individual's aptitude or achievement level . . . rather than reflecting the individual's

impaired sensory, manual, or speaking skills (except where those skills are the factors that the examination purports to measure).

28 C.F.R. § 36.309(b)(1)(I) (emphasis supplied).  The regulation further states:

A private entity offering an examination covered by this section shall provide appropriate auxiliary aids for persons with impaired sensory, manual, or speaking skills, unless that entity can demonstrate that offering a particular auxiliary aid would fundamentally alter the measurement of the skills or knowledge the examination is intended to test or would result in an undue burden.

28 C.F.R. § 36.309(b)(3).  The regulations state that the "[a]uxiliary aids and services required by this section may include . . . Brailled or large print examinations and answer sheets or qualified readers for individuals with visual impairments[.]"  28 C.F.R. § 36.309(b)(3).  The ADA provides that for "individuals with visual impairments," the term "auxiliary aids and services" includes "qualified readers, taped texts, *or other effective methods of making visually delivered materials available*[.]"  42 U.S.C. § 12102(1)(B) (emphasis supplied).  Defendant concedes that these lists of auxiliary aids are illustrative, not exhaustive.

Defendant neither claims that 28 C.F.R. § 36.309(b)(1)(I) which contains the "best ensures" standard is inapplicable, nor argues that it is arbitrary or capricious. Instead it contends that the only reasonable interpretation of the "best ensure" standard is to find that it employs the "reasonable accommodation" standard used in implementing the Rehabilitation Act of 1973 and Title I of the ADA.  *Fink v. N.Y. City Dep't of Personnel*, 53 F.3d 565 (2d Cir. 1995), the Second Circuit case which Defendant cites as mandating this result, was decided under Section 504 of the Rehabilitation Act.  *Fink* does not mention, let alone address, either the "accessibility" standard of 42 U.S.C. § 12189 or the "best ensure" standard of 28 C.F.R. § 36.309(b)(1)(I).  In *Fink*, the Second Circuit affirmed the district court's grant of summary judgment which addressed plaintiff's challenge not to the accommodations provided by the defendant "but to the matter in which two reader-assistants carried out their duties."  *Fink*, 53 F.3d at 567.  Noting that there was no allegation that the defendant was responsible for the readers' faulty

performance, the Second Circuit ruled that the district court had properly concluded that the "disturbances of which the plaintiffs complained were not the result of discrimination prohibited by the [ADA], but rather 'random occurrence which, by chance, adversely affect' disabled employees or candidates." *Id.* at 567-68.   *Fink* noted that defendant demonstrated without contradiction that they made reasonable accommodations. In light of the absence of any discussion of either the meaning of "accessibility" or the proper interpretation of the "best ensures" standard, the court finds *Fink* does not control the court's determination of the very different legal challenges and factual issues presented here.

The U.S. Department of Justice has submitted a Statement of Interest, pursuant to 28 U.S.C. § 517 (Doc. 32), contending that Defendant is wrong in its choice of standards and that the "best ensure" standard indisputably governs this case and is not interchangeable with a "reasonable accommodation" standard. For the following reasons, the court agrees.

Both the ADA and its implementing regulations are designed to allow persons with disabilities to compete on an equal basis with non-disabled persons. In determining how this equality might best be achieved, Congress required entities offering licensing examinations to do so in a place and manner that is "accessible" to disabled persons or to offer "alternative accessible arrangements" for such individuals. *See* 42 U.S.C. § 12189. The term "accessible" is not defined and may mean accessible at any cost or burden, the best access available under the circumstances, what is "reasonably accessible" applying some form of balancing test, or accessible meaning capable of being accessed regardless if the accessibility offered is effective or meaningful. Each of these definitions is arguably reasonable without statutory guidance for determining "accessibility." The court thus finds 42 U.S.C. § 12189's use of the term "accessible" ambiguous in terms of what it requires.

"If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984).

However, if congressional intent is unclear or ambiguous, then the court must decide whether "the agency's answer is based upon a permissible construction of the statute." *Id.* at 843. Where, as here, Congress has made an "express delegation of authority to the agency to elucidate a specific provision of the statute by regulation, such regulations are given "controlling weight unless they are arbitrary, capricious, or manifestly contrary to statute." *Id.* at 844.

This court, like several other courts,[4] concludes that 28 C.F.R. § 36.309(b)(1)(i) is neither arbitrary nor capricious, nor manifestly contrary to the statute it implements. The court thus concludes that a "best ensure" is entitled to controlling weight and governs the outcome in this case. A "best ensure" standard not only prevents an entity such as Defendant from directly or indirectly providing "a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit and to reach the same level of achievement as that provided to others[,]" 28 C.F.R. § 35.130(b)(1), it also reflects the special challenges to the establishment of a level playing field in the administration of professional exams. Unlike in the employment sector where a "reasonable accommodation" may be adjusted over time, a professional examination is generally a one-time event wherein the accommodations either ensure equality or do not. Perhaps for that reason, the ADA's "reasonable accommodation" requirement under Title I was not used by Congress in enacting 42 U.S.C. § 12189 under Title III which requires "accessibility" in the offering of professional and licensing exams.[5]

---

[4] The recent trend of authority supports a conclusion that the "best ensures" standard applies. *See Enyart v. Nat'l Conference of Bar Examiners*, 630 F.3d 1153, 1163 (9th Cir. 2011) (applying a "best ensure" standard as the means of ensuring an individual with a disability has an equal opportunity to demonstrate her knowledge and abilities to the same degree as other non-disabled individuals taking the MPRE); *see also Bonnette v. Dist. of Columbia Court of Appeals*, 2011 WL 2714896, at *19 (D.D.C. July 13, 2011); *Elder v. Nat'l Conference of Bar Examiners*, 2011 WL 672662, at *6 (N.D. Cal. Feb. 16, 2011).

[5] The "best ensure" standard was adopted from the Department of Education's requirements under Section 504 of the Rehabilitation Act governing admissions examinations in post-secondary institutions. 28 C.F.R. pt. 36, app. B at 715 (2009) (referring to 34 C.F.R. § 104.42(b)(3). Similarly, Section 12112(b)(7) of Title I of the ADA requires that tests

Having determined that Defendant must grant accommodations to Plaintiff that "best ensure" that her knowledge of the law governing a lawyer's ethical and professional obligations is tested by the MPRE rather than the extent to which Plaintiff is able to overcome her uncontested disabilities, the court turns to the question of whether Defendant's proposed accommodations are "reasonable accommodations" as a matter of law such that no further inquiry is warranted.

It cannot reasonably be disputed that what renders an examination "accessible" to one disabled individual may not render it "accessible" to another. Even Defendant concedes that Plaintiff has two disabilities that require accommodations. None of the "auxiliary aids" Defendant has offered Plaintiff to date fully or reasonably address her learning disorder. Rather than make an individualized inquiry regarding Plaintiff's needs, Defendant has taken the position that its menu of accommodations is "reasonable" even though the "menu" in question is designed only for the visually impaired. Although Defendant is correct in noting that neither Plaintiff's preferences nor her primary reading method need be accommodated, it remains an individualized inquiry, and not a one-size-fits-all approach that drives the court's analysis.

Whether the standard is "reasonable accommodation" or "best ensures," what must take place is a "fact specific, individualized analysis of the disabled individual's circumstances." *Wong v. Regents of Univ. of Cal.*, 192 F.3d 807, 818 (9th Cir. 1999); *see also D'Amico v. N.Y.S. Bd. of Law Examiners*, 813 F. Supp. 217, 221 (W.D.N.Y. 1993) ("An individual analysis must be made with every request for accommodation[.]"). For this reason, the court rejects Defendant's invitation to decide the case based on what Congress, the U.S. Department of Justice, other courts, and advocacy groups for the blind have indicated are reasonable and appropriate in other cases for other individuals presenting different disabilities.

_____

"concerning employment" be selected and administered "in the most effective manner to ensure" that the test reflects the disabled job applicants' or employees' aptitude rather than their disabilities. The "best ensure" standard thus reflects the importance of an equal opportunity where an examination determines whether a disabled person will even be allowed to enter the playing field, much less compete effectively on it with his or her non-disabled peers.

The court also rejects the Defendant's suggestion that the court adopt a Maryland district court's analysis in denying a request for injunctive relief for visually impaired applicants for the MPRE who sought to use screen access software. In *Elder v. NCBE*, No. 10-1418 (D. Md. 2010), Trs. at 73 (Mew Decl. Ex. 5), based upon what it characterized as an inadequate factual record, the court orally ruled that an accommodation that provides "reasonable accessibility," a term not used by Congress, satisfies the "best ensures" standard. It further found sufficient accommodations that "are historically sound, [and have] been accepted by [DOJ] in other ways; [and] which . . . show that [Defendant] is acting entirely reasonably to make the examinations accessible." *Id.*; *see also Elder v. National Conference of Bar Examiners*, No. 1:10-cv-01419-JFN, Doc. No. 49 (D. Md. July 13, 2010) (offering a one page written opinion to supplement the court's oral ruling and denying both NCBE's motion to dismiss and plaintiff's request for injunctive relief). The court has found no authority, and Defendant cites none, that would allow a "historically sound" accommodation that has been used by DOJ in other cases to determine the outcome of what accommodations comport with either the "best ensure" standard or a "reasonable accommodations" standard in Plaintiff's case.

In any event, even were the court to apply a "reasonable accommodations" standard to Plaintiff's request for injunctive relief in this case, a different outcome would not result. Under either standard, Defendant must offer Plaintiff an even playing field in accessing the MPRE. *See Felix v. New York City Transit Authority*, 324 F.3d 102, 107 (2d Cir. 2003) ("The ADA mandates reasonable accommodation of people with disabilities in order to put them on an even playing field with the non-disabled[.]") .

### C. Whether a Preliminary Injunction Should be Granted.

The court has already identified the requirements for the extraordinary remedy of a preliminary injunction. It now turns to whether Plaintiff has satisfied those exacting standards with regard to her requested accommodations on the August 5, 2011 MPRE.

### 1. *Irreparable Harm.*

Irreparable harm is "the single most important prerequisite for issuance of a preliminary injunction." *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d

Cir. 1998) (quoting *Bell & Howell: Mamiya Co. v. Masel Supply Co. Corp.*, 719 F.2d 42, 45 (2d Cir. 1983)). "To satisfy the irreparable harm requirement, [p]laintiff[ ] must demonstrate that absent a preliminary injunction [she] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (internal quotation marks omitted).

In assessing the possibility of irreparable harm, courts "'must not adopt a categorical or general rule or presume that the plaintiff will suffer' such harm, but instead must actually consider the injury the plaintiff will suffer if he or she loses on the preliminary injunction but ultimately prevails on the merits, paying particular attention to whether the 'remedies available at law, such as monetary damages, are inadequate to compensate for that injury.'" *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010) (quoting *eBay, Inc. v MercExchange, L.L.C.*, 547 U.S. 388, 391, 393-94 (2006)).

In this case, Plaintiff will suffer irreparable harm if she is not allowed to take the August 5, 2011 MPRE exam with her requested accommodations because if she takes the test without them, her ability to work through her disabilities rather than her knowledge of the subject matter of the test will be the aptitude tested. In effect, Plaintiff will be required to take a "high stakes" examination in discriminatory circumstances.

In addition, to require Plaintiff to take the MPRE during the school year will interfere with her abilities to attend to her law school studies and perform to the best of her ability. This, in turn, may affect the employment opportunities available to Plaintiff as potential employers evaluate her law school performance.

Finally, Plaintiff credibly testified that she has already invested considerable time, money, and effort in studying and otherwise preparing for the August 5, 2011 MPRE. There is no dollar amount that the court may readily ascribe to either Plaintiff's expenditure of these efforts, or to the loss of their potential fruits in the form of a passing score on the MPRE. A passing score on the MPRE is a condition precedent to Plaintiff's ability to practice law in Vermont and every MPRE test she does not take is a lost opportunity to satisfy that requirement prior to her graduation.

Although Defendant is correct in noting that mere delay in taking a professional entrance or licensing exam is generally not considered irreparable harm, here there is no evidence that time will make any significant difference with regard to the accommodations Defendant is willing to offer Plaintiff.  In other words, Plaintiff is likely to face the same obstacles in November, March, and July that she is facing now.  Accordingly, while Plaintiff is losing opportunities to take the MPRE, there is no countervailing benefit she obtains through the passage of time.  Indeed, the passage of time is likely to exacerbate her harm as it may delay completion of her law school education and may delay her entry into her chosen professional field.

Defendant's assertion that Plaintiff *could* take the MPRE without her requested accommodations and *still pass* is not commensurate with a "best ensure" standard and is inconsistent with the objectives of the ADA.  *See Bonnette*, 2011 WL 2714896, at *19 (the fact that plaintiff  "*could* take the [exam] using a human reader does not mean that this accommodation would best ensure that her score reflected her achievement level rather than her visual impairment; [plaintiff] is entitled to an auxiliary aid that allows her to perform at her achievement level, not just one that might be good enough for her to pass.").

In *Enyart, Bonnette*, and *Elder*, the courts all found that the plaintiffs established a likelihood of irreparable harm if they could not take the exam with the specific accommodations they sought.  In *Enyart*, the court found a likelihood of irreparable harm in the form of "(1) the loss of the chance to engage in normal life activity, *i.e.*, pursuing her chosen profession, and (2) professional stigma." *Enyart*, 630 F.3d at 1165.  The plaintiff in that case also argued that she faced irreparable injury as a result of NCBE's violation of the ADA; the court did not address this argument, finding that plaintiff demonstrated irreparable harm in the form of loss of opportunity to pursue her chosen profession.

In *Bonnette*, the plaintiff contended that she would either have to take the exam under discriminatory conditions or wait until a later administration while her claim is litigated, and any delay in taking the MBE deprived her of time to practice her chosen

profession. The court held that further delay would be more irremediable, not less, and found it significant that plaintiff had devoted substantial time and effort to preparing for the exam which would be effectively wasted if she had to wait until a later date.

In *Elder*, the court articulated the choice confronting the plaintiff as either taking the exam under discriminatory conditions and risk failure and delay his ability to practice law, or postpone taking the exam until after a determination on the merits and likewise suffer a delay in his ability to practice law. Under either scenario, the court found that plaintiff would be likely to suffer irreparable harm. The *Elder* court also held that having plaintiff take the exam without a computer equipped with software would force him to take the exam under discriminatory circumstances, which would, in and of itself, cause him irreparable harm. *See Elder*, 2011 WL 672662, at *10 (citing *Chalk v. U.S. Dist. Court Cent. Dist.*, 840 F.2d 701 (9th Cir. 1988)). There, too, the court considered the investment of substantial time and money in preparing for the test as part of the irreparable harm analysis.

Almost two decades earlier, the *D'Amico* court anticipated these grounds for finding irreparable harm:

> While plaintiff's injury is related to her ability to be admitted to practice law and secure legal employment and income, it goes well beyond these monetary considerations. Plaintiff's injury is the result of ongoing discrimination based on her medical disability. The issuance of injunctive relief is appropriate when a disabled person loses the chance to engage in a normal life activity. But for plaintiff's disability and the Board's reluctance to allow her to take the exam over a four day period, she would have an equal opportunity to be admitted to the practice of law.

*D'Amico,* 813 F. Supp. at 220 (citations omitted); s*ee also Agranoff v. Law School Admission Council, Inc.*, 97 F. Supp. 2d 86, 88 (D. Mass. 1999) (agreeing with plaintiff that he will suffer irreparable harm because he would lose the time and effort he had spent in a preparatory course and with a tutor, preparing for a particular administration of the LSAT, and that taking exam at later date would prejudice his applications at law schools); *cf. Maczaczyj v. State of N.Y.*, 956 F. Supp. 403, 408 (W.D.N.Y. 1997) (applying *D'Amico* to case where student was denied admission to master's program, as "[t]his

exclusion will most likely affect plaintiff's ability to engage in the future employment of his choice."); *but see Christian v. N.Y. State Bd. of Law Exam'rs*, 1994 WL 62797, at *2 (S.D.N.Y. Feb. 23, 1994) (finding that plaintiff would not be irreparably harmed if application for injunctive relief was to be denied. Plaintiff suffered from undetermined problem, requested special accommodations, was already admitted to practice law in New Jersey, and court found that money damages could compensate plaintiff for loss of earnings and anguish because of the delay in taking the New York bar exam). The courts finds *Enyart*, *Bonnette*, *Elder*, and *D'Amico* persuasive.

Because the court finds that an award of damages will not compensate Plaintiff for the lost opportunity to take the MPRE exam on August 5, 2011, and further finds that Plaintiff will suffer immediate, irreparable, and non-speculative harm in the loss of her preparatory and studying efforts, the time she incurred during the school year to amass the considerable documentation she needed for her requested accommodations, and the ensuing need to take the MPRE either during the school year with the attendant impact on her studies, or after she graduates with the attendant impact on her success on the bar exam, the court concludes that Plaintiff has sufficiently demonstrated irreparable harm to warrant preliminary injunctive relief.

   2. *Likelihood of Success of the Merits.*

Plaintiff has also proffered evidence that establishes a clear and substantial likelihood that not only are her requested accommodations ones that will best ensure that her knowledge of professional ethics is properly tested, but they are also ones that are reasonable under the circumstances based upon an individualized inquiry. Plaintiff's experts collectively offered credible and persuasive testimony in support of Plaintiff's requested accommodations and fully explained why Defendant's proffered accommodations are inadequate. Plaintiff's primary and most effective means of accessing lengthy written material is achieved only through her use of screen access software that she has consistently and successfully used over the past eight years. Plaintiff has used each of Defendant's proposed accommodations and has demonstrated that they are not effective for her because they do not allow her to effectively and fluidly

access written material, and because they do not reasonably accommodate her dual disabilities.

Defendant, who does not dispute that Plaintiff has both a visual and learning disability, offered no countervailing evidence and has not even evaluated its own proposed accommodations for their reasonableness or efficacy in Plaintiff's case. In such circumstances, a court should give considerable weight to the opinions of Plaintiff's treating professionals who opine that the accommodations Plaintiff seeks are the only ones that will allow her to fully access the MPRE. *See D'Amico*, 813 F. Supp. at 223 ("[I]n a case where there is no medical evidence to the contrary, and the treating physician's opinion does not appear on its face to be outrageous, it is appropriate for the Court to give great weight to the physician's opinion as to the nature of the accommodations required for his patient.").

Defendant's further argument that because its proposed accommodations have worked for other visually impaired test takers (but not for ones who also suffer from Plaintiff's learning disorder), they may also work for Plaintiff and Plaintiff should be required to at least try them and fail before she is permitted to request anything different, is wholly inconsistent with the plain language and the underlying objectives of the ADA.

Defendant's alternative suggestion that Plaintiff should be confined to accommodations that she requested and were provided to her on the LSAT several years ago notwithstanding the progressive nature of Plaintiff's visual impairment and the fact that her learning disability was not the subject of accommodations is similarly without merit. "[A]ssistive technology is not frozen in time; as technology advances, testing accommodations should advance as well." *Enyart*, 630 F.3d at 1163. Indeed, the ADA fully contemplates that the accommodations which are required may change over time and must keep pace with technological developments. As the applicable legislative history reveals:

> The Committee wishes to make it clear that technological advances can be expected to further enhance options for making meaningful and effective opportunities available to individuals with disabilities. Such advances may require public accommodations to provide auxiliary aids and services in the

future which today would not be required because they would be held to impose undue burdens on such entities.

Indeed the Committee intends that the types of accommodations and services provided to individuals with disabilities, under all of the titles of this bill, should keep pace with the rapidly changing technology of the times.

H.R. Rep. 101-485(II), at 108 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 391; *see also* 28 C.F.R. pt. 36, app. C (2011).[6]

Defendant's complaint that Plaintiff failed to engage in an interactive process to determine reasonable accommodations does not alter the court's conclusion that Plaintiff is likely to succeed on the merits. Here, both parties failed to engage in a meaningful discussion of anything other than what each was demanding. Neither more time nor more discussion is likely to alter the status quo. In fact, Defendant concedes that it does not actually need more time to evaluate Plaintiff's Accommodations Request because in the absence of a court order, it has no present intention to either send Plaintiff for an independent evaluation, or to offer any further accommodations.

Finally, the court concludes that Defendant has failed to establish its affirmative defense of either a fundamental alteration of what the MPRE tests or undue burden. Plaintiff's proposed accommodations do not in any way alter the content of the MPRE, only the manner in which it is presented. Defendant does not claim otherwise.

Defendant does, however, request the court to find that Defendant will encounter an undue burden by administering the MPRE to Plaintiff on August 5, 2011 with the requested accommodations. Although Defendant concedes that the burden in Plaintiff's case is relatively minor, offering the requested accommodations may engender other requests creating a significant expense and altering the way Defendant operates and

---

[6] For this reason, the court concludes that Defendant's extensive evidence regarding accommodations that were deemed appropriate many years ago, or for different individuals with different needs, constitutes an inappropriate benchmark for what must be offered to render the MPRE "accessible" to Plaintiff. Indeed, Defendant's approach would actively discourage the development of technology and would not only freeze in time what may be considered a "reasonable accommodation" but would also dispense with any need for an individualized inquiry.

allocates its resources. Defendant cites no authority for the proposition that the court must consider whether the requested accommodations pose an undue burden in other, hypothetical cases in order to properly evaluate Defendant's burden in making an accommodation. Even if this were the standard, Defendant has proffered insufficient evidence to support its application to this case.

In light of Defendant's significant financial resources, its prior provision of the accommodations nearly identical to those Plaintiff has requested, and its ability to adequately address its concern that a visually impaired person such as Plaintiff may be able to copy or steal the MPRE while being watched by a one-on-one proctor, the court concludes that Defendant has failed to establish an undue burden.

3. *Balance of the Equities and the Public Interest.*

"[B]ecause a preliminary injunction is an exercise of equitable authority, a court considering such a motion should consider the balance of equities, including the public interest, involved." *Olson v. Wing*, 281 F. Supp. 2d 476, 489 (E.D.N.Y. 2003) (citing *Million Youth March, Inc. v. Safir*, 155 F.3d 124, 125 (2d Cir. 1998)). Defendant strenuously argues that Plaintiff has created her own emergency by seeking injunctive relief in a carefully selected forum (where Plaintiff has lived for over twenty-two years) little more than a month prior to the MPRE exam and as part of a concerted effort to bring such lawsuits to appease "the animating force behind the lawsuit [which is] the National Federation of the Blind (the "NFB"), an advocacy group that aggressively supports 'high impact' litigation on behalf of its members." (Doc. 34 at 3). Not only has Defendant failed to introduce any evidence to support this allegation, it acknowledges, as it must, that Plaintiff filed her Accommodations Request weeks in advance of the deadline for doing so which Defendant itself set. If that deadline was unreasonable because of the complexity of Plaintiff's disabilities, Defendant has itself to blame.

The court has found that Plaintiff acted diligently and in good faith to obtain and submit the comprehensive documentation necessary to support her Accommodations Request and that her request was made as soon as practicable after the receipt of those materials. Defendant, in turn, processed that request in a reasonably timely manner

although it demonstrated no urgency in handling Plaintiff's request. Moreover, although Defendant claims that it has been severely prejudiced by Plaintiff's delay, it does not identify anything that it would do with additional time other than to hire expert witnesses to defeat Plaintiff's claim. To this day, Defendant cannot state whether it will ever offer Plaintiff her requested accommodations. Instead, it has offered only to merely *consider* them.

Certainly the timing of Plaintiff's request for injunctive relief presents a legitimate inconvenience for Defendant (and for the court and presumably Plaintiff). Defendant has nonetheless advised the court that, if ordered, it can accommodate Plaintiff's request with the expenditure of approximately $5,000 and three and a half day's time. In such circumstances, the court cannot find that the balance of equities favors Defendant. To the contrary, any delay in the resolution of Plaintiff's Accommodations Request with no countervailing benefit and considerable harm to Plaintiff tips the balance of equities decidedly in Plaintiff's favor.

Finally, the public interest compels the court to order accommodations that will best ensure a disabled person's access to a professional exam that will, in part, determine whether he or she may practice a chosen profession. "The ADA serves the important function of ensuring that people with disabilities are given the same opportunities and are able to enjoy the same benefits as other Americans." *Felix*, 324 F.2d at 107. The public's interest in the integrity of secure, professional licensing exams while important and legitimate does not trump the ADA.

ORDER

For the foregoing reasons, the court hereby:

1.   GRANTS a preliminary injunction requiring Defendant to provide to Plaintiff the following accommodations for the August 5, 2011 MPRE exam in addition to those accommodations already granted by Defendant: (a) the use of a Windows XP laptop computer equipped with ZoomText 9.12 and Kurzweil 3000 v. 11.05 to read all examination materials; (b) an opportunity to test the laptop with sample

25

MPRE questions in electronic format to ensure the equipment is functioning properly; and (c) the use of peripheral devices with the laptop during the test consisting of a Windows keyboard modified with white on a black background, large lettering, and Braille finger placements, a 22-inch widescreen monitor mounted on an adjusted arm, a corded mouse, and stereo speakers.  With Defendant's consent, Plaintiff may supply these peripheral devices for the MPRE exam.

2.   Pursuant to Fed. R. Civ. P. 65(c), Plaintiff shall place a bond or other security in the amount of $5,000 in Plaintiff's counsel's escrow or trust account by 8:00 a.m. on August 5, 2011 and provide certification of the same to the court. The court finds this security sufficient to compensate the costs and damages sustained by the Defendant, if any, in the event the Defendant is found to have been wrongfully enjoined.

SO ORDERED.

Dated at Rutland, in the District of Vermont, this _2nd_ day of August, 2011.

Christina Reiss, Chief Judge
United States District Court